# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**KEVIN J. SULLIVAN,**
        **Petitioner,**

**v.**                                    **Case No.:    4:12cv250/RV/CAS**

**JULIE L. JONES,**
        **Secretary, Florida**
        **Department of Corrections,**
        **Respondent.**

_____

## ORDER, REPORT AND RECOMMENDATION

On April 29, 2013, Petitioner Kevin J. Sullivan, through counsel, filed a second amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254  (Doc. 22). Respondent filed an answer and relevant portions of the state court record (Doc. 35). Petitioner filed a reply (Doc. 41).  The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B).  The Court conducted an evidentiary hearing on March 9, 2015, on Petitioner's first claim for relief, and after careful consideration of the parties' arguments, the record and the evidence adduced at the evidentiary hearing, it is the opinion of the undersigned that Petitioner is entitled to habeas relief on his claim that his trial counsel  was constitutionally ineffective by defending his case based on the legally impermissible defense of voluntary intoxication instead of advising Petitioner to accept the State's pretrial plea offer. However, Petitioner is not entitled to habeas relief on the remaining four claims in his petition.

## I. BACKGROUND AND PROCEDURAL HISTORY

In 2003, Kevin Sullivan was charged with fleeing or attempting to elude (count one), possession of cocaine (count two) and possession of paraphernalia (count three). Petitioner's trial was held in May of 2005.  Petitioner was represented by trial counsel Ben Bollinger.  At the conclusion of the trial, the jury found Petitioner guilty as charged

for all three offenses.  The trial court sentenced Petitioner to thirty years' imprisonment on count one, and Petitioner was habitualized on this count.  For count two, the trial court sentenced Petitioner to five years' imprisonment to run concurrent to the sentence for count one and gave Petitioner credit for time served as to count three. On direct appeal, Petitioner raised two issues: (1) that the trial court erred in denying his motion to disqualify, and (2) that the trial court erred in declaring him a Habitual Felony Offender because the State did not sufficiently prove the date of his current felony offense. The First District Court of Appeal *per curiam* affirmed Petitioner's convictions and sentences without opinion.  *Sullivan v. State*, 937 So. 2d 128 (Fla. 1st DCA 2006).  The First District issued its mandate on September 18, 2006.

In November of 2007, Petitioner filed a *pro se* motion to correct illegal sentence pursuant to Fla. R. Crim. P. 3.800 (a), arguing an improper calculation of jail credit, which was granted in part and denied in part.  Petitioner appealed, and the First District *per curiam* affirmed the denial.  A motion for rehearing was denied, and mandate issued on July 24, 2008.  On July 10, 2008, Petitioner filed a second Rule 3.800(a) motion, seeking to correct fines and costs, which was granted in part and denied in part.  Petitioner did not appeal.

On August 15, 2008, Petitioner filed an initial Rule 3.850 motion for postconviction relief, and on September 11, 2008, he filed an amended motion.  In his amended motion, Petitioner raised four claims for relief: (1) that defense counsel was ineffective for failing to subject his trial to any meaningful adversarial testing by (a) conceding guilt on two counts, and (b) failing to raise an insanity defense; (2) that defense counsel was ineffective in failing to call Petitioner as a witness; (3) that defense counsel was ineffective in failing to present mitigating evidence during the "penalty phase;" and (4) that defense counsel was ineffective for waiving the affirmative defense of insanity without Petitioner's consent.  Petitioner was represented by Robert Augustus Harper, III, in filing the petition and by present federal habeas counsel at the evidentiary hearings which the postconviction court conducted on April 27, 2010, and August 27, 2010.  On December 2, 2010, the postconviction court denied the Rule 3.850 motion.

Petitioner appealed, and the First District *per curiam* affirmed the denial without opinion. *Sullivan v. State*, 93 So. 3d 1019 (Fla. 1st DCA 2012). A motion for rehearing was denied on April 17, 2012, and mandate issued on May 3, 2012.

Petitioner filed his initial federal habeas petition on May 17, 2012. (Doc. 1). On the same day, Petitioner filed a motion to stay the proceeding pending exhaustion of a successive motion for postconviction relief in state court based on newly discovered evidence learned during Petitioner's state court evidentiary hearing, namely the issue raised in ground one of Petitioner's second amended federal petition. (Doc. 5). After the Court denied an initial and amended motion to stay without prejudice, (*see* docs. 6 & 12), Petitioner filed an unopposed amended motion to stay the proceedings (doc. 15), which the Court granted on December 11, 2012 (doc. 16). The state postconviction court denied Petitioner's successive motion, and the First District affirmed the denial on April 5, 2012. Thereafter, Petitioner then filed a second amended federal habeas petition updating the procedural history of his case. (Doc. 22). Respondent filed an answer and a motion to dismiss portions of ground one in response to Petitioner's second amended petition. (Doc. 35). In ground one of his second amended habeas petition, Petitioner raised an ineffective assistance of trial counsel claim arguing that his counsel had defended his case based on a legally impermissible defense of voluntary intoxication instead of advising him to accept the State's pretrial plea offer. (*See* doc. 22 at 19-23). Petitioner filed a reply and argued as to ground one that he could establish cause and prejudice for any procedural default as to this claim pursuant to *Martinez v. Ryan*, 132 S. Ct 1309 (2012), based on the ineffective assistance of his state court postconviction counsel in failing to raise on collateral review his trial counsel ineffective assistance claim. (Doc. 41 at 5-7). On January 14, 2015, the Court ordered an evidentiary hearing on the alleged ineffective assistance of both trial and postconviction counsel. (Doc. 43). On February 26, 2015, Respondent filed a motion for summary judgment and accompanying statement of facts and exhibits, as to the claims which were the subject of the hearing. (*See* docs. 49, 50 & 51). Respondent also filed a motion to continue the evidentiary hearing. (Doc. 48). The Court denied the motion to

continue (doc. 52).  At the evidentiary hearing, Respondent withdrew its motion for summary judgment.  The parties filed post-hearing memorandums.  (Docs. 60, 61 & 64).The petition is now ripe for adjudication.

## II.  STATE COURT PROCEEDINGS

Trial court proceedings

The facts surrounding Petitioner's crime are recounted in Respondent's statement of undisputed material facts filed with its motion for summary judgment.  (*See* doc. 50 at 1-8).  Succinctly recited, at trial, Bollinger reserved opening statement for the close of the State's case.  At the close of the State's case, the defense presented no evidence, thus Petitioner did not testify.  During the charge conference, the State asked for an instruction that voluntary intoxication is not a defense.  Bollinger sought an instruction on insanity.  The State argued that notice was required to argue insanity, and the trial court agreed that the defense had not complied with the notice requirements for insanity to be asserted.   Bollinger responded that the issue arose at trial based on the testimony presented.  The trial court indicated that Petitioner had the remedy of a mistrial, but Bollinger waived a mistrial after informing the court that he had spoken with Petitioner.  The trial court confirmed the waiver as follows:

> THE COURT: Okay.  You understand, Mr. Sullivan, if you chose to do so, you could ask the Court to declare a mistrial and allow you to file notice of intent to rely on insanity, then the Court would then follow the rules in terms of having experts appointed and reporting back to the Court and allow [you to] go forward on the defense of insanity at the time of the offense?
> THE DEFENDANT: Yes, Your Honor, I understand that.
> THE COURT: And you are agreeing that Mr. Bollinger does not have to file a motion for mistrial at this time . . .

(Doc. 35-1 at 339-40).  Bollinger presented initial and rebuttal closing arguments.  Bollinger conceded the possession of cocaine and drug paraphernalia charges.  In its closing, the State asserted that voluntary intoxication is not a defense in Florida and argued that Petitioner's actions were the product of conscious intent.  In rebuttal, Bollinger argued that Petitioner's actions were not willful, intentional and knowing because the arresting officer's testimony demonstrated that Petitioner was mentally

deranged, that the jail refused to admit Petitioner and that the absence of evidence why suggests that it may be due to a problem with his mental intent.  The trial court questioned Petitioner about whether he agreed to his counsel conceding guilt to the two offenses, and Petitioner agreed to the concession.  The trial court instructed the jury that neither voluntary intoxication nor insanity was a defense to the offenses charged. The jury found Petitioner guilty, and the trial court sentenced him on July 15, 2005.

### III.  STANDARD OF REVIEW

Federal courts may issue habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.  In relevant part, § 2254(d) provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (2006).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[1]  The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant

---

[1] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and – except as to the footnote – Scalia) in part II (529 U.S. at 403-13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).  The federal habeas court "determining whether [it] should overturn the state courts' [sic] rejection of the claim at issue" should "review the highest state court decision disposing of the claim."  *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1237 (11th Cir. 2011); *see  Knowles v. Mirzayance*, 556 U.S. 111 (2009).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue.  Dicta in opinions is not controlling.  *Thaler v. Haynes*, 559 U.S. 43 (2010); *Bowles v. Sec'y for Dep't of Corr.*, 608 F.3d 1313, 1315 (11th Cir. 2010).  A federal court of appeals decision cannot clearly establish federal law for § 2254 purposes, even if its holding is directly on point. *Bowles*, 608 F.3d at 1316 (citing *Renico v. Lett*,130 S. Ct. 1855, 1866 (2010)).

After identifying the governing legal principle, the court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. To be entitled to deference, the state court decision need not cite to Supreme Court case law.   As the Supreme Court clarified:  "Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases – indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405–06).  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. *See Panetti v. Quarterman*, 551 U.S. 930 (2007).

If the state court decision is not contrary to clearly established federal law, the

federal habeas court must then determine whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court.  *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697 n. 4 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the state court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context."  *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).  A state court may "decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]" without running afoul of the "unreasonable application" clause.  *Knowles*, 556 U.S. at 122.  Notably, even a state court's incorrect or erroneous application of clearly established law will not warrant federal habeas relief unless it is also objectively unreasonable.  *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."); *Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").  When  faced with a state appellate court's summary affirmance of a trial court's decision, the "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.   *See Gill v. Mecusker*,  633 F.3d 1272, 1287 (11th Cir. 2011) (citing *Harrington*, 131 S. Ct. at 786).  The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists

could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See Harrington*, 562 U.S. at 101; *see also Gill*, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  As with the "unreasonable application" clause, the Supreme Court applies an objective test.  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.").  The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See Gill*, 633 F.3d at 1292.

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see e.g., Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").  Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and §2254(e)(2) interact in the context of fact-based challenges to state court adjudications.  *Cave v. Sec'y for Dep't of Corr.*, 638 F.3d. 739 (11th Cir. 2011).  However, in a recent Eleventh Circuit decision the court declined to grant habeas relief under § 2254(d)(2), in

the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti*, 551 U.S. at 953. The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102. Habeas corpus relief "is a guard against extreme malfunctions in the state criminal justice system, not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (internal quotation marks omitted). Finally, in the event that constitutional error is found in a habeas proceeding, the relevant harmless error standard is set forth in *Brecht v. Abrahamson*, 507 U. S. 619 (1993). The test is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but are not entitled to habeas relief based on trial error unless they can establish 'actual prejudice.'" *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).[2]

## IV.  PETITIONER'S CLAIMS

Ground One:        Ineffective Assistance of Trial Counsel

In ground one of his second amended petition, Petitioner alleges that his trial counsel, Ben Bollinger, rendered ineffective assistance of counsel by defending his case based on a legally impermissible defense of voluntary intoxication instead of advising him to accept the State's pretrial plea offer.  (Doc. 22, pp. 19-23).

---

[2] This harmless error standard is also applicable to cases involving habeas challenges to death sentences.  *See Calderon v. Coleman*, 525 U.S. 141 (1998); *Duest v. Singletary*, 997 F.2d 1336 (11th Cir. 1993); *Hicks v. Head*, 333 F.3d 1280 (11th Cir. 2003).

1.      State Court Proceedings

As discussed *supra*, the state court did not address the merits of this claim.  The Court conducted an evidentiary hearing on this issue and will consider the claim *de novo*.[3]

2.      Clearly Established Supreme Court Law

a.      Procedural Default

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner first exhaust available state court remedies, 28 U.S.C. §2254(b)(1),[4] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  *Duncan*, 513 U.S. at 365-66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard*, 404 U.S. at 277-78.

An issue that was not presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, *i.e.*, procedurally barred from federal review.  *O'Sullivan*, 526 U.S. at 839-40, 848; *Bailey v. Nagle*, 172 F.3d 1299, 1302-03 (11th Cir. 1999).  The Court will also consider a claim

---

[3] In reviewing this claim the Court did not consider the testimony of Clyde Taylor Jr., who was offered as an expert witness by Petitioner and testified as to postconviction counsel's ineffective assistance. *See Freund v. Butterworth*, 165 F.3d 839, 863 n.4 (11th Cir. 1999)(en banc).

[4] Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
            (A)  the applicant has exhausted the remedies available in the courts of the State; or
            (B) (i)  there is an absence of available State corrective process; or
                 (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *Coleman v. Thompson*, 501 U.S. 722, 734-35 and n. 1 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308 (1991).

A petitioner may obtain federal review of a procedurally defaulted claim if he can show both cause for the default and actual prejudice resulting from the default. "To establish 'cause' for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir.1999).  In *Martinez v. Ryan*, *supra*, 132 S. Ct. at 1320, the Court created a narrow, equitable exception to *Coleman* and held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the [State's] initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."  In such instances the underlying ineffective assistance of trial counsel claim must have some merit.  *See also Trevino v. Thaler*, 133 S. Ct. 1911 (2013) (extending *Martinez*'s holding to those state systems that, in actual operation, make it "virtually impossible" for an ineffective assistance of trial counsel claim to be presented on direct review). Finally, to establish prejudice so as to warrant review of a procedurally defaulted claim, a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003) (citations omitted).

b.     Ineffective Assistance of Counsel

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To obtain relief under *Strickland*, a

habeas petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.*, 466 U.S. at 687.  It is a petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable and that he suffered prejudice as a result thereof.  *Id.*  If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.  A reviewing court need not address both components of the *Strickland* inquiry when a petitioner makes an insufficient showing on one.  *Turner v. Crosby*, 339 F.3d 1247, 1279 (11th Cir. 2003); *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

In determining whether counsel's performance was reasonable, the Court instructed:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  *Cf. Engle v. Isaac*, 456 U.S. 107, 133–134, 102 S. Ct. 1558, 1574–1575, 71 L. Ed.2 d 783 (1982).  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  *See Michel v. Louisiana*, *supra*, 350 U.S. at 101, 76 S. Ct. at 164.

*Strickland*, 466 U.S. at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer

might do.'" *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1314–15 n. 15 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.1994). "[T]here are no 'absolute rules' dictating what reasonable performance is or what line of defense must be asserted." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317)). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions .'" *Id.* (quoting *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir.2001)).

As to the prejudice prong of the *Strickland* standard, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Strickland*, 466 U.S. at 693. The Court has also clarified, however, that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. *Id.*, 466 U.S. at 693–94. Instead,

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694. The prejudice assessment does "not depend on the idiosyncrasies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual

> findings that were affected will have been affected in different ways.
> Some errors will have had a pervasive effect on the inferences to be
> drawn from the evidence, altering the entire evidentiary picture, and some
> will have had an isolated, trivial effect.  Moreover, a verdict or conclusion
> only weakly supported by the record is more likely to have been affected
> by errors than one with overwhelming record support.  Taking the
> unaffected findings as a given, and taking due account of the effect of the
> errors on the remaining findings, a court making the prejudice inquiry must
> ask if the defendant has met the burden of showing that the decision
> reached would reasonably likely have been different absent the errors. . . .
> [T]he ultimate focus of inquiry must be on the fundamental fairness of the
> proceeding whose result is being challenged.

*Id.* at 695–96.  Finally, the Supreme Court recently explained the interplay between

AEDPA's standard  of review and the deferential standards established by *Strickland* as

follows:

> The standards created by *Strickland* and § 2254(d) are both "highly
> deferential," *id.*, at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320,
> 333, n. 7, 117 S. Ct. 2059, 138 L. Ed.2d 481 (1997), and when the two
> apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S.,
> at ——, 129 S. Ct. [1411] at 1420. The *Strickland* standard is a general
> one, so the range of reasonable applications is substantial. 556 U.S., at
> ——, 129 S. Ct. at 1420 .  Federal habeas courts must guard against the
> danger of equating unreasonableness under *Strickland* with
> unreasonableness under § 2254(d). When § 2254(d) applies, the question
> is not whether counsel's actions were reasonable. The question is whether
> there is any reasonable argument that counsel satisfied *Strickland*'s
> deferential standard.

*Harrington v. Richter*, *supra*, 562 U.S. at 105.  Habeas claims of ineffective assistance,

of counsel, therefore, require "doubly deferential" judicial review under § 2254(d) and

*Strickland*, and petitioners only rarely prevail on this ground. *See Rogers*, 13 F.3d at

386.  "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559

U.S. 356 (2010).

      3.     Federal Review of Claim

      a.     Ineffective Assistance of Postconviction Counsel

      To establish ineffective assistance of state habeas counsel, Petitioner must show

both that habeas counsel's performance, in failing to present to the state habeas court

the evidence that he presented in federal court, was deficient and that he was prejudiced by the deficient performance, that is, that there is a reasonable probability that he would have been granted state habeas relief had the evidence been presented in the state habeas proceedings. *See Strickland*, 466 U.S. at 687; *Martinez*, 132 S. Ct. at 1318 (suggesting that the *Strickland* standard applies in assessing whether habeas counsel was ineffective).  The Court is mindful that to show that his postconviction counsel failed to provide the level of representation required by *Strickland*, Petitioner must demonstrate more than the mere fact that his counsel failed to raise potentially meritorious claims; he must show that no competent counsel, in the exercise of reasonable professional judgment, would have omitted those claims.

In analyzing this claim, the first question is whether postconviction counsel, Harper, knew that there had been a pretrial plea offer in this case.[5] Harper testified several times during the evidentiary hearing that Petitioner never told him about any pretrial plea offer, as reflected in this exchange:

> THE COURT: All right.  From 2005 to 2009.  During the time that–let's focus on you.  During the time that you were representing Mr. Sullivan, did he mention to you that prior to trial Mr. Bollinger and the State had on the table a plea?
> HARPER: No, sir.
> THE COURT: He never mentioned that?
> HARPER: No, sir.
> THE COURT: During the time when you represented him, did he ever tell you that, if I had known the voluntary intoxication defense was not a legal defense, I would have taken the plea?
> HARPER: No, sir.
> THE COURT: He never mentioned that?
> HARPER: No, sir.

(Evidentiary Hearing ("EH"), doc. 59, pp. 140-41). *See also id.* at 73 (Harper testified,

---

[5] There was conflicting testimony offered during the evidentiary hearing as to the terms of the final pretrial plea offer.  Petitioner testified that the offer was ten years (Evidentiary Hearing ("EH") at 100); Ben Bollinger testified and provided an affidavit stating that the final offer was eleven years (EH at 18; doc. 42-1).  Brian Kelley, the assistant state attorney who prosecuted the case against Petitioner, testified that he and Bollinger tried to work out a plea in the case and his recollection was that the offer was "somewhere between 12 and 15 years.  My hunch was 12, 13 years."  (*Id.* at 54).

"[w]e, Mr. Sullivan and I, talked about a lot of things.  A plea offer never came up.  So I was not aware of one, no, sir.").  The Court also asked Harper, "[a]side from what Mr. Sullivan ever told you, did you know that there was a plea offer prior to trial?"  Harper answered, "[n]o sir.  I had no idea."  (*Id.* at 141).

Petitioner testified that he never discussed the pretrial plea offer with Harper because he was not asked about it, adding that he did not try to keep any plea negotiations from his attorney, and stating, "I didn't think about the plea.  I just didn't think about it. [Harper] didn't ask me, and I didn't think about it."  (*Id.* at 119). Petitioner also testified that he did not realize that the plea offer may be relevant to his state court postconviction proceedings until just prior to the 3.850 evidentiary hearing in April of 2010 when discussing the case with his current counsel of record. (*Id.* at 118).

Based on the testimony taken at the evidentiary hearing, it is undisputed that Harper was not aware of the pretrial plea offer at issue in this claim.  In addition, Harper testified that he was unaware of the specific issue Petitioner raises here, *i.e.*, Bollinger was ineffective for defending his case based on the invalidated voluntary intoxication defense instead of advising him to take the plea.  As to the this issue, Harper testified that it "was never on my radar at the time."  (*Id.* at 88).

Petitioner argues that Harper's performance was deficient because he never asked him if a plea had been offered and rejected; Harper did not contact Bollinger about this or any other issue; and Harper never made a records request to see if the case files contained any plea information.  Petitioner contends that these failures were the result of Harper's failure to conduct a reasonable investigation into the facts of his case.  Respondent argues that Petitioner never raised the plea issue with Harper, despite outlining twenty-two issues and sub-issues which he wanted raised, despite writing the Harper firm sixty-six letters, and despite Petitioner's assurances to Harper that he was in the best position to inform the firm about circumstances which would not be obvious from the record.[6]  *See* doc. 61 at 26-27; 30.

---

[6] In all of this correspondence there is only one isolated and arguably ambiguous reference to a plea. In a letter to Peter Kitzerow which was sent to the Harper firm, Petitioner writes, "A bad situation to

Evidence presented at the evidentiary hearing, however, reveals that even though Harper did not know about the pretrial plea offer, he did not raise a claim related to the invalidated defense of voluntary intoxication because he believed that Petitioner knew before trial that this defense had been abolished.  Therefore, Harper testified that he would not have raised the instant claim "[b]ecause ultimately I would have had to commit perjury."  (EH at 80).  Harper explained:

> And so my understanding of the case was that he and Mr. Bollinger knew that the state attorney's office over there had had enough.  And this was just my impression.  I don't know why.  I can't remember every single conversation going back that far.  But they'd had enough, no more plea offers, we're going to trial because we've got to do something here, and we have a scenario where we're caught red-handed, in essence.  There's no true defense that a jury is going to believe.  So we went in there, and we did the only thing we could, which is to confuse or hybridize certain defenses in hopes of convincing the jury that he was so out of his mind he couldn't possibly have formed the requisite intent to commit the crime.  And in that moment at trial, that was his best moment, that was his only moment.  It's going to work or it's not.  And if it doesn't, we're going to go down in flames together.  And if it doesn't work, I'll help you as far as I can help you.  And it was pretty obvious that Mr. Bollinger did everything that he could, I felt, personally, and that it was a strategy that they both agreed on.  And they went with it, and it didn't work, and they were still willing to do whatever it took.
> And I could be a part of that or not.  And I wanted to help, and I wanted to be a part of it, but just not–I couldn't file a claim that I felt like–I couldn't file a claim that was dishonest, because I knew eventually I would appear before a court and I would be dressed down.

(*Id.* at 143-44).  The Court asked Harper to give an example of a claim that he felt was dishonest, and the following exchange occurred:

> HARPER: Because there were so many different claims, I really can't. But the voluntary intoxication defense, you know, it was very confusing for me.  I was young, to begin with, and Mr. Sullivan is very smart, very persistent, and it can get confusing.  But I thought I knew what was happening.  It's just a matter of whether or not I was willing to trick myself.
> THE COURT: What do you mean by trick yourself?

---

be sure, and not pretty to be sure.  But if I had known the Judge would disallow my defense I obviously would have taken a deal."  (Doc. 51-1, Ex. FF-1 at 7).

HARPER: Into believing my client.
THE COURT: Did you believe that Mr. Sullivan knew the voluntary
intoxication defense was invalid before trial?
HARPER: 100 percent, no question.
THE COURT: That he knew it?
HARPER: He knew it.  I mean, yes, sir.[7]

(*Id.* at 144-45).  Respondent refers to two letters which Petitioner wrote to Harper which support its argument that Petitioner knew that the voluntary intoxication defense had been invalidated prior to trial.  Harper's testimony  tends to support the view that he formed his opinion as to Petitioner' knowledge based at least in part on this correspondence.  In a letter dated September 30, 2007, Petitioner writes "Mr. Bollinger did inform me that voluntary intoxication, presented through a backdoor approach, would be our defense at trial."  (Doc. 51-1, Ex. FF-74).  Harper testified that he understood this to mean that Petitioner knew before trial that voluntary intoxication was a defense that needed to be presented through a backdoor approach.  (EH at 78).  Harper believed that Petitioner's letter dated May 10, 2008, (Doc. 51-1, Ex. FF-86), wherein he stated, "[Bollinger] informed me that he would be pursuing a backdoor voluntary intoxication defense, even though it was no longer a legally recognized defense, thus this backdoor approach," again showed that Petitioner knew that the strategy was to present this defense through a backdoor.  (EH at 80).[8]  Harper testified

---

[7] Harper testified that he graduated from law school in 2004 and had practiced four years prior to handling Petitioner's case. (EH at 70).  Harper characterized Petitioner as "a handful," explaining "[h]e was someone that needed a lot of attention.  He had a lot to say, had a lot of questions, and so he elicited a lot of answers.  He was a handful."  (*Id.* at 71).

[8] During the evidentiary hearing, Petitioner addressed these letters and the mention of a backdoor approach as follows:
    Q. [Petitioner's Counsel Donald Pumphrey]: Now, when you are writing this, the term
    "backdoor" has come up, and you've heard it today.
    A. [Petitioner]: Yes, I have.
    Q. Where did that come from?
    A. Mr. Bollinger told me that he was going to present a voluntary intoxication defense and
    he was going to utilize a backdoor approach to do so.  And what he said that that would
    entail would be to plead guilty to the possession charge and the paraphernalia charge.
    And that's what I assumed he was talking about when he said the backdoor approach.
    Q. At any time was there discussion that voluntary intoxication–prior to trial was there any
    discussion, in context, during that period of time, that it's not a lawful strategy or defense,

that he based his belief as to Petitioner's knowledge about the invalidated defense on
their correspondence and also because he and Petitioner "talked on the phone, and he
told me that–precisely what they did, which was to go in there and give it their best shot
and try to make the water as murky as possible and hope for the best." (*Id.* at 174).
However, when the Court asked Harper if during these conversations Petitioner told him
that he knew the defense was no longer a legally recognized defense, Harper
responded, "I don't recall that specifically, so I can't answer that affirmatively." (*Id.*).

Harper also testified that one reason his firm withdrew from representing
Petitioner prior to the state court 3.850 evidentiary hearing, aside from financial issues,
was "I just had an ethical or moral feeling about the case, and it made me
uncomfortable" because of the substance of the discussions he had been having with
Petitioner. (*Id.* at 91).  Harper explained that "I was uncomfortable making a lie, even if

---

> voluntary intoxication?
> A. No.
> Q. Ever say the word "abolished"?
> A. The word never came up, and Mr. Bollinger never told me that that defense was
> abolished.  And I was shocked when Mr. Kelley said that at the end of trial.

(EH at 113-14).  Petitioner testified that once he was convicted and in prison he did some legal research,
and it was then that he learned that voluntary intoxication had been abolished as a defense on October 1,
1999. As to his September 30, 2007 letter, Petitioner explained:

> But I was explaining to Mr. Harper, my post-conviction counsel, because he was asking
> for my input, about what type of defense it was.  And I told him that [Bollinger] informed
> me that he would be pursuing a backdoor voluntary intoxication defense.  And I had
> referenced that in several other letters to Mr. Harper.
> And then I put a comma in that sentence, and it says, Even though it was no longer a
> legally recognized defense.  So I was sharing, again, my knowledge with Mr. Harper that
> even though we had this defense, I now know that it's not a legally recognized defense. . .
> .
> The first part of the sentence, I'm sharing with Mr. Harper that that was our defense,
> voluntary intoxication, and that it was going to be pursued through a backdoor approach.
> And I think I put that part, the backdoor voluntary intoxication, in three or four other letters
> to Mr. Harper.
> The second part after the comma was really–I guess it should have been a period, but I
> put a comma.  And it says, Even though it was no longer a legally recognized defense.
> I was not saying in that sentence that Mr. Bollinger told me it was not legally recognized.  I
> was sharing with Mr. Harper my newfound knowledge, I guess you would call it, from the
> law library that it's no longer a legally recognized defense.

(*Id.* at 117-18).

Case No.: 4:12cv250/RV/CAS

it would have helped." (*Id.*) The Court asked for further clarification of this statement,

and the following exchange occurred:

> HARPER: I felt like there was–this is just my feeling.  I could be wrong.
> But I felt like there was an opportunity here where I could have saved Mr.
> Sullivan ten years had I made a conscious decision to lie.  And it was very
> confusing, and I know it happens, but I couldn't do it.
> THE COURT: Well, unfortunately, I'm going to have to ask you, what was
> it, what were the circumstances surrounding that issue that you thought
> you would have to lie to save him ten years?
> HARPER: I thought that I would be put in a position to either say there
> was some plea offer that was conveyed that never happened or primarily
> this defense that was not a defense but really the only thing, in my
> opinion, that they had a chance to convince the jury.
> I was not–in my opinion, I sized the case up, and I think I know what
> happened.   And I think what happened was Mr. Sullivan and his attorney
> knew they had some real problems with their case, and the only way to
> get out of this problem is to get in front of a jury and make it confusing and
> stay in the gray areas and hope that you get it to the jury ultimately.  And it
> didn't work.
> And I certainly could understand why they did it.  I just wasn't comfortable,
> with the power of hindsight, going back and saying something different
> than that.

(*Id.* at 92-93).  Harper explained his ethical quandary more fully as follows:

> My ethical quandary was that–and I'm generalizing here, but we had his
> prior attorney, Mr. Bollinger, willing to do anything to help out Mr. Sullivan,
> and therefore the world was my oyster, if I wanted it.  And we talked, you
> know, over the course of, like you said, years, and there were telephone
> calls in between the letters, and you just–there's a feeling.  You have to
> determine–see the big picture and determine if somebody is telling the
> truth and the ramifications of that.
> And there came point where I realized that I could help Mr. Sullivan if I
> agreed to become part of the plan, I suppose, or if I was willing to say the
> right thing or file the right claim, I could have perhaps had his sentence
> reduced.  But I felt like I would be creating or re-creating history and facts
> that didn't happen.

(*Id.* at 141-42).

Based on Harper's testimony, it is reasonable to conclude that he believed that

the State was unwilling to offer Petitioner a plea and was insistent on going to trial.

Therefore, Harper believed that because there were not any good defenses available,

Bollinger decided to argue the voluntary intoxication defense which he, and Petitioner, knew had been invalidated in an indirect, or backdoor, fashion with the hope of confusing the jury enough that they would find Petitioner not guilty.  If Harper had been correct that no plea had been offered, then his assumption that Petitioner and Bollinger intentionally raised an invalidated defense may have been reasonable, along with his decision not to raise the instant claim in postconviction.  *See Nix v. Whiteside*, 475 U.S. 157, 173 (1986)(holding that an attorney who, when his criminal client informed him that he would perjure himself on the stand, indicated that he would seek to withdraw from representation did not thereby deprive client of his Sixth Amendment right to counsel or establish prejudice required for relief based on ineffectiveness of counsel); *Smith v. Sec'y, Fla. Dep't of Corr.*, 572 F.3d 1327, 1340 n.14 (11th Cir. 2009)("attorneys are not required to violate ethical standards to serve their client's ends. A defendant has no constitutional right to have his attorney present evidence that the attorney believes is false.").  However, Harper was not correct in his assumption that the State was adamant about taking the case to trial, and his belief that no plea had been offered was incorrect. The critical inquiry then is whether Harper's investigation of this issue was reasonable under *Strickland*.

While Harper testified that he developed the feeling that Petitioner knew the intoxication defense was invalid before trial based on his conversations with Petitioner, Harper admitted that he did not verify this information by speaking with Bollinger.  (*Id.* at 68, 148-49). In fact, Harper testified that he did not recall speaking with Bollinger on the telephone nor did he meet with him.  (*Id.* at 149).  Harper testified that he had an ethical concern in this case, stating, "[t]he issue that created my ethical conflict was that I had a client telling me that his trial attorney was on board and willing to say he was ineffective and do whatever it takes."  (*Id.* at 150). When asked whether he communicated with Bollinger in order to see whether his ethical compass was on point or not, Harper testified that he did not. Harper testified that he consciously decided not to contact Bollinger because "I didn't want to hear the–I didn't want to hear the BS.  I know what the standard is and what it takes to get there, and having an attorney fall on his sword is

valiant, but I didn't want to be a part of that scene." (*Id.* at 95).[9]  Harper acknowledged

that he had nothing other his communications with Petitioner to indicate that he and

Bollinger knew that voluntary intoxication had been abolished before trial. The following

exchange occurred during the hearing as to what investigation Harper conducted:

> Q.[Petitioner's Counsel Donald Pumphrey]: Did you take any steps
> whatsoever to see it there was any basis for those ethical concerns,
> outside of Mr. Sullivan?
> A. [Harper]: Yes.
> Q. And what was that?
> A. I chose not to present the claim that he wanted me to.
> Q. And that claim was?
> A. That he was not advised prior to trial that voluntary intoxication was not
> a defense.
> Q. What about the plea?
> A. Plea was never on my radar at all, ever, at any time.
> Q. Just so we clarify, and I think you said that earlier, the plea issue was
> never on your radar.
> A. Yes, sir.
> Q. That means you never even thought to investigate it or look at it or
> question about it?
> A. No, that's not what I mean.  As you know, the thing with pleas is that's
> the easiest, most obvious source to determine whether someone's
> decision to go to trial was right or wrong.  In talking with a client, you're
> always going to start off with, Okay, tell me what happened.  Why did you
> go to trial?  And almost invariably they're going to say, because I had to,
> the offer was this.
> In addition to that, you know, there is the discovery, answer to demand for
> discovery.  And so there's an assumption that plea offers are going to be
> in writing where they should be conveyed by the State.

---

[9] The Court notes that at one point during the hearing Harper testified that he did attempt to
contact Bollinger.  Harper testified as follows:

> I felt like it was some sort–I was involved in some sort of game or I was being
> manipulated.  And I would reach out to Mr. Bollinger.  He would conveniently not be there.
> The way I would recall it, he would send me a letter saying that he attempted to contact
> me and I didn't answer.  And it was this back and forth thing that contributed to my
> uneasiness and my trepidation about opening up that can of worms.
> And so I did attempt [to contact him] a couple of times.  And I guess that's what I was
> alluding to when I said my door is open, if he has something to say. I almost lived at my
> office.  It's not difficult to get ahold of me.  And I just felt like I was being deceived.

(EH at 166).

(*Id.* at 156-57).  Ultimately, however, Harper testified that he relied on Petitioner to explain why he went to trial.

Evidence presented at the hearing, therefore, suggests that Harper did not take any additional steps to investigate the existence of the plea offer.  Harper did not ask Petitioner about it directly, nor did he contact Bollinger or the state attorney about this issue. As to Harper's belief that Petitioner knew that the voluntary intoxication defense had been abolished prior to trial, there is some basis in the record, namely the two letters identified by Respondent, from which Harper could have formed this opinion. However, Petitioner's explanation as to his use of the "backdoor" strategy is not necessarily unreasonable when considered in context.  What is most troubling are Harper's comments about "feeling" that he understood what had happened without explicitly verifying it with either Petitioner or Bollinger or conducting an independent investigation into the issue.  At the hearing, Harper testified, "*[b]ut I thought I knew what was happening*.  It's just a matter of whether or not I was willing to trick myself" (*Id.* at 144); "I just had an *ethical or moral feeling about the case*, and it made me uncomfortable" (*Id.* at 91); "*I felt like there was–this is just my feeling*.  I could be wrong. But I felt like there was an opportunity here where I could have saved Mr. Sullivan ten years had I made a conscious decision to lie.  And it was very confusing, and I know it happens, but I couldn't do it" (*Id.* at 92); and "[a]nd we talked, you know, over the course of, like you said, years, and there were telephone calls in between the letters, *and you just–there's a feeling.*" (*Id.* at 141).[10]  While it may have been reasonable for Harper to have been skeptical about what Bollinger may have been willing to say to help Petitioner in postconviction, it is not reasonable, without more than a feeling, to *assume* that Bollinger would lie without at least contacting him and exploring the issue.  The record is clear that Petitioner repeatedly urged the Harper firm to contact Bollinger. While Harper's testimony was somewhat equivocal on his attempts to contact Bollinger, the

---

[10] Both Bollinger and Petitioner testified at the evidentiary hearing that they did not learn that the voluntary intoxication defense had been abolished until the prosecution raised the issue during the trial.

weight of the evidence is that Harper's ultimate failure to contact Bollinger was intentional because he felt Bollinger would lie to him in order to help Petitioner.[11]

Much of Respondent's argument that Harper was not deficient in investigating the existence of a pretrial plea centers on the fact that Petitioner never identified the issue in his extensive correspondence with Harper and instead focused on other issues that he wanted Harper to pursue.  While it is reasonable for an attorney to rely on his client for information, particularly if the information is primarily known only to the client, the duty to investigate possible claims rests not on the client, but on the attorney.  Here there is no question that Harper did not know about the existence of a pretrial plea offer. He, therefore, could not have raised the instant claim.  Because Harper did not know about the pretrial plea offer, he felt that he could not find prejudice under *Strickland* in relation to the invalidated voluntary intoxication defense.  Harper testified "ultimately I was trying to look off into the distance and see the prejudice, and I couldn't get to, I couldn't overcome that element, and it wouldn't have made a difference."  (*Id.* at 94). Harper also wrote the following to Petitioner:

> Since the beginning, we spoke about the fact that your trial lawyer

---

[11] It is unclear whether this was a default assumption in Harper's postconviction cases. In a letter from Harper to Petitioner dated June 23, 2008, Harper wrote that his firm had not attempted to contact Bollinger.  He stated that they usually did not contact the trial attorney until an evidentiary hearing had been granted.  The letter continued as follows:

> At that point, it will be absolutely necessary to contact him.  Hopefully, he will be a man of his word.  However, we do a lot of these motions, and we conduct a lot of evidentiary hearings.  And I'm sure it doesn't surprise a man of your intellect to know that what a lawyer 'says he's willing to say' and what he 'actually says on the stand during the hearing' tend to be remarkably different.  It's extremely rare to find a trial lawyer willing to 'lay on the sword.'  Therefore, we will continue to conduct our business and prepare our case assuming that your trial lawyer will be no help at all.  That way, we will not be surprised should his testimony change in court.

(Doc. 58-2, Ex. JJ-2).  Harper also testified that Bollinger had the opportunity to communicate with him. Harper described instances of trial attorneys showing up on his doorstep to say they messed up and wanted to help.  (EH at 151).  Harper explained, "[s]o in that sense, there was an opportunity.  I felt like the–I just knew what was going on.  The telephone calls back and forth that was–I think it was an attempt–this is just my opinion–I'm not saying it's right or wrong.  But I think it was an attempt by Mr. Bollinger to appease Kevin, to say that he did what he said he would do.  But if there was a real concern, I mean, the door was always open."  (*Id.*).

attempted to defend you with a "non-existent" defense.  And for a long
time, we planned on raising that in your 3.850.  However, as we
researched, we realized that there was one serious problem with raising
this claim.  And the problem is this: if we assert that your lawyer attempted
to raise a defense that really wasn't a defense, then what we are really
saying is that there was no defense to your case.  Admittedly, voluntary
intoxication was not a defense.  And voluntary intoxication was a defense
that your lawyer relied on.  However, if we were to raise that here, we
would be shooting ourselves in the foot.
Instead of raising that particular claim, we instead incorporated the
"essence" of that claim into the other claims.  We alleged that your lawyer
failed to provide any defense whatsoever.  We alleged that your lawyer
was incompetent in every meaning of the word.  And by alleging that your
lawyer provided effectively no assistance of counsel, and provided no
defense, we feel that we can still prove ineffective assistance of counsel.
Had we raised the issue of voluntary intoxication, and had we argued that
your lawyer was ineffective for relying on that defense, the State would
have certainly mentioned that, because voluntary intoxication was not an
affirmative defense, we failed to prove prejudice as required by *Strickland*.

(Doc. 58-2, Ex. JJ-2 at 3)).  The prejudice is clear, however, once the plea offer is

considered.  Petitioner was sentenced to thirty years in prison.  If he had taken the plea

offer, his sentence would have been significantly less, assuming for purposes of this

review at most twelve years.  While there is no guarantee that Petitioner would have

ultimately prevailed on this issue on collateral appeal, there is a reasonable likelihood

that he would have, given that the Court finds Petitioner's claim that Bollinger rendered

ineffective assistance meritorious. *See infra*.

Generally, counsel's strategic decisions are afforded deference so long as they

are based on counsel's "professional judgment." *Strickland*, 466 U.S. at 680.  However,

if a purportedly tactical decision is not preceded by a reasonable investigation, then it is

not sufficiently informed and not entitled to the deference typically afforded counsel's

choices. *See Sears v. Upton*, 561 U.S. 945, 954 (2010) ("We reject[ ] any suggestion

that a decision to focus on one potentially reasonable trial strategy.... [i]s 'justified by a

tactical decision' when 'counsel did not fulfill their obligation to conduct a thorough

investigation of the defendant's background'" (citation omitted)). As discussed *infra*,

there is a reasonable probability that the state court would have granted habeas relief if

the instant issue had been presented in the state habeas petition.  Accordingly, given the totality of the evidence before the Court, including Harper's relative inexperience at the time, the Court finds that it was unreasonable for Harper to fail to investigate the issue further by contacting Bollinger and/or the state attorney.  Because it was not reasonable for Harper to limit his investigation to communications with Petitioner only, particularly since it appears that Harper never specifically asked him about a pretrial plea offer, the Court finds that Harper's representation was deficit under *Strickland* and that Petitioner was prejudiced by this deficient representation, *i.e.*, Petitioner is serving a thirty year prison sentence as opposed to a twelve year prison sentence.

However, even if a petitioner makes both of the showings required under *Martinez*, that "does not entitle [him] to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 132 S. Ct. at 1320.  Therefore, the Court will now consider Bollinger's performance with respect to this claim.

b.    Ineffective Assistance of Trial Counsel

Petitioner testified at the evidentiary hearing that the Thursday before jury selection, which was to occur the following Monday, Bollinger met with him and first told him that Assistant State Attorney Brian Kelley had extended a ten year plea offer.  (EH at 100). Petitioner testified that he told Bollinger that he was interested in a plea but asked him to see if Kelley was amenable to anything better, perhaps seven or eight years.  Bollinger also told him that he would be pursuing a voluntary intoxication defense because fleeing and eluding was a specific intent crime so that defense would apply.  (*Id.*).  In order to pursue this defense and to show the jury that he was intoxicated, Bollinger advised Petitioner that he would have to plead guilty to the cocaine possession and paraphernalia charges. Petitioner testified that he was not comfortable about that but Bollinger convinced him it was necessary in order to present this defense.  Petitioner testified that there was no discussion about the legality of the defense.  Petitioner testified, "[t]here was never any discussion about legality.  Again, the only discussion was that it would apply–we did have a discussion about specific

intent." (*Id*. at 103).

Petitioner testified that over the weekend prior to trial an inmate had advised him that fleeing and eluding was not a specific intent crime, so he asked Bollinger about that on the Monday of jury selection.  Bollinger told him that he was confident about the specific intent issue, and Petitioner "always believed and trusted what Mr. Bollinger said.  He had just won my other case." (*Id*. at 104). Petitioner also asked if Kelley had made another plea offer.  Petitioner stated that even though he knew that he was facing possibly thirty years in prison, "Mr. Bollinger said that from Thursday until Monday he had been rehearsing voluntary intoxication extensively, he had videotaped himself, that he was very confident in the defense, that it absolutely would apply to fleeing, and that his advice was to proceed to trial and to turn down the plea offer." (*Id*.).  Petitioner did not know that voluntary intoxication had been abolished until Kelley informed the court that he would be asking for a jury instruction that it was no longer a viable defense. Petitioner then testified about what occurred:

> Q. [Pumphrey]: Now, at this point, where are you at in the trial when this information is being addressed with the Court?
> A. [Petitioner]: It was very close to the end of the State's case.  We didn't present any witnesses, so it was basically the State's case.
> Q. And was there a recess for you and Mr. Bollinger to have a lengthy discussion on this?
> A. There was a recess right about that time, yes, sir.
> Q. How long did you and Mr. Bollinger discuss what had just come out?
> A. I was in the back, and Mr. Bollinger came back about five or ten minutes later.  And it was a short conversation.  I had asked him–I told him, I said, I don't think things are going too well.  It appears our defense is gone.  Could you speak to Mr. Kelley and see if possibly there's still a plea offer available?
> And Mr. Bollinger stated, Don't bail out on me now.  We're going to continue on with the trial.  And so that's what we did.

(*Id*. at 106).  Petitioner testified that Bollinger did not speak to Kelley again about a plea, and there was no additional discussion concerning the strategy moving forward.[12]

---

[12] Petitioner's testimony on this issue is consistent with the testimony he gave in his 3.850 evidentiary hearing held in April 2010.  (*See* Ex. S, doc. 35-3 at 355-58; 365 & doc. 35-4 at 1-2; 26-27).

Petitioner testified that he would have taken the plea rather than going to trial if he had known that voluntary intoxication had been abolished, explaining:

> Well, I found out at the end of–Mr. Bollinger questioned all the witnesses and asked them if I was intoxicated or looked intoxicated or if I was high. And so he presented this defense throughout the trial, that I was intoxicated.  And then at the end of the trial I find out from the prosecutor and the judge that it's an abolished defense.  So, therefore, I had no defense.  And if there's no defense for your case and you're facing 30 years and the prosecutor has offered you ten, you need to take that.

(*Id.* at 109-10).  Petitioner testified that under these circumstances he also would accepted a twelve year plea offer.

Bollinger testified at the evidentiary hearing that he was admitted to practice law in 1996, after which he opened his own law practice which is limited to criminal defense work.  (*Id.* at 47).  Bollinger testified that he represented Petitioner in a 2001 fleeing and eluding case in which the jury found Petitioner not guilty. In that case their defense strategy was that Petitioner did not know he was fleeing from a police officer, so voluntary intoxication was not an issue.  (*Id.* at 18-19). Bollinger did not recall ever having gone to trial on a fleeing and eluding case, other than Petitioner's first trial. Bollinger also testified that he had never had a trial where voluntary intoxication was a defense or an issue. Petitioner's second fleeing and eluding trial, stemming from a 2003 arrest, was held in May of 2005.  Bollinger testified that he did at least three and maybe five felony jury trials a year between 1996 and 2005.  During that period he was handling two to three hundred cases a year and very few went to trial, so he had entered pleas in close to a thousand cases.

Bollinger testified that maybe a week before trial, he and Kelley discussed a plea in the case.  Bollinger's recollection is that the final pretrial plea offer was eleven years. (*Id.* at 18-19).  Bollinger stated that he never knew of the trial judge, Judge Sirmons, rejecting a stipulated plea agreement.  (*Id.* at 17). Bollinger testified that at the time of the plea negotiations he was not aware that voluntary intoxication had been abolished. When asked whether Petitioner knew that the defense had been abolished when he was considering the plea offer, Bollinger stated, "I didn't know that it was, so there was

no way I could have had that discussion with him." (*Id.* at 20).  The following exchange

occurred with regard to Bollinger's defense strategy:

> Q. [Pumphrey]: Did you convey your personal or professional feelings
> regarding the potential success of the trial, based upon the defense of
> voluntary intoxication, in talking to [Petitioner] about the plea offer?
> A. [Bolllinger]: I thought we had a very good chance.  Based on all the
> officers' reports, all of them in those reports I think were saying he was
> dazed, he was deranged.  When I was going back and looking through my
> notes over the weekend, I was noticing that when I would write about all
> the reports–because I make sheets on every report so I would know what
> the officers' testimonies will be.
> And so it was fitting in line with him, of course, possessing the cocaine
> and using cocaine.  So that was sort of–I thought, hey, this is a shoo-in.
> That's what I honestly thought.
> Q. And did you share those thoughts directly with Mr. Sullivan when he
> was going through his thought processes whether to accept or reject the
> plea offer?
> A. Oh, yeah.  We met at the jail. The jail used to be right across the street
> from my office before they tore it down, so I would always go to the jail
> and talked to Kevin.  And he was very involved with his case, and we
> would sit down and go through, okay, this is what this witness says, this is
> what we're going to argue here.  He was very involved with everything.
> * * * *
> Q. But regardless of the enhancement penalty, your feelings about
> success at trial were still the same as you shared them with Mr. Sullivan?
> A. Based on my thought process of the voluntary intoxication being a good
> defense.
> Q. At any point in your representation of Mr. Sullivan, did he ever not
> follow your advice or recommendations?
> A. Not that I remember, no.
> Q. And was it your recommendation for Mr. Sullivan not to accept the plea
> offer as conveyed in the robing room just prior to trial?
> A. Yes, because we were still a little off from where I thought we wanted to
> be.

(*Id.* at 20-22).[13]  Bollinger testified that he believed that the plea offer was probably

---

[13] At the 3.850 hearing in state court in 2010, Bollinger testified that he felt bad going into this trial.
On cross-examination in the federal evidentiary hearing when asked about this inconsistency, Bollinger
explained, "I felt bad from the public relations standpoint because of the media and everything, and I had
sort of a feeling like this is Russian roulette and we're spinning the chambers here and I hope we don't
lose on this one.  But in relation to the voluntary intoxication and what all the witnesses were saying, I felt
good, legally, going into the second trial."  (EH at 44).

withdrawn once the trial started which was the normal procedure.  When asked  if he would have advised Petitioner differently had he known that their sole defense strategy was abolished, leaving them without any defense, Bollinger answered that he would have advised Petitioner that  [w]e need to try to figure out what the best deal is and take it because we're probably going to get lit up at trial if we lose, or when we lose, because really that was the only defense we had." (*Id.* at 25).  Bollinger stated that he would have advised Petitioner to take the eleven year plea offer because his prior criminal history meant that he was facing thirty years in prison.

As to the issue of a backdoor approach to the voluntary intoxication defense, Bollinger testified that as part of his strategy for the voluntary intoxication defense, they would admit to the cocaine charges, explaining as follows:

> Q. [Pumphrey]: And was that somewhat of a backdoor approach to support the voluntary intoxication?
> A. [Bollinger]: Yeah, because we were going to concede a little bit and get a lot in return.  That was sort of the way I was thinking about it.
> Q.  In other words, it's not a typical trial strategy to admit to felony charges, is it?
> A.  It's not typical.  I've done it a few times, but you don't normally want to do that because of the exposure of the felony you're admitting to is at least five years . . .
> Q.  And, Mr. Bollinger, is that somewhat of a backdoor theory, to try to get the jury to acquit on the heavier charge that's PRR[14] under voluntary intoxication but still take a hit on the lesser felony offenses of possession of cocaine?
> A.  Yes, sir.
> Q.  And did you have that discussion with Mr. Sullivan?
> A.  Yeah.  I remember having that discussion about admitting to the cocaine, because I don't really think Kevin wanted to admit to the cocaine because we knew what Judge Sirmons was going to do.  He was going to give him the five years.  So, I was like, Well we're going to need to give a little bit because, if not, you're going to face a lot of time.  I remember having those discussions with him.
> Q.  And in other words, in those discussions, you explained the strategy of backdooring the cocaine and obviously exposing himself to that in order to try to defeat, on a voluntary intoxication defense, the primary charge of

---

[14] Prison Releasee Reoffender Punishment Act, Fla. Stat. § 775.082(9).

fleeing and eluding?
    A.  Correct.

(*Id.* at 29-30).[15]  Bollinger testified, "[t]hat the whole intent of admitting to the cocaine, was to bring in the voluntary intoxication, say, well, that's what he was intoxicated on, was the cocaine, and so that's why they arrested him for the cocaine."  (*Id.* at 32-33). Bollinger explained that he tried to bring out from each witness that Petitioner appeared to be "out of it," and that this was a theme throughout his questioning.  Bollinger also explained, "whenever I was finally shot down on the voluntary intoxication, I sort of had to shift gears and sort of think on my feet, okay, well, I'm going to try to use this insanity stuff.  So I started trying to use terms like deranged and–I started to try to use those things to basically recoup something.  So it changed a little bit mid-trial."  (*Id.* at 34). As to how Bollinger felt when he realized that voluntary intoxication was not going to be a valid defense in the case, the following exchange occurred:

> Q.[Pumphrey]: Can you share with the Court how you were feeling when you had that realization in court with Mr. Sullivan?
> A.[Bollinger]: I felt like an idiot.  That's sort of how I felt about it.  I felt, man, I've messed this thing up, and that's why I sort of had to switch gears and try to think of something.  And that's why I was sort of going along with the insanity type thing.  Then I got shut down on that, and then I was a bigger idiot.  To be honest, that's sort of how I felt about it.  It upsets me, but I'm the one that got caught flatfooted in this trial.
> Q.  And even though–well, at the time you're having these feelings, are you still trying to keep your composure in front of your client and the jury?
> A.  Yes.

---

[15] The Court asked Bollinger if he specifically used the term "backdoor" when discussing with Petitioner his admitting to the possession and use of cocaine.  Bollinger answered, "I don't know if I would have–I know I've used that term before, and I have, but I don't specifically recall using it in Mr. Sullivan's case, but it is a term that I would use."  (EH at 30).  While Bollinger thinks a backdoor strategy would have related to admitting to the cocaine charges, he stated, "[b]ut I don't specifically remember, you know, using that, but I know I've used the term before, but I don't specifically remember having that conversation with Mr. Sullivan."  (*Id.* at 32).  On cross-examination, Bollinger was again questioned about the backdoor approach referred to by Petitioner in his letters to Harper.  Bollinger reiterated that he did not recall using that term with Petitioner, but that he "was trying to use it for the intoxication defense on the fleeing and eluding" and that he and Petitioner "talked about bring[ing] in voluntary intoxication by admitting to the cocaine so that then we could beat the fleeing and eluding charge." (*Id.* at 41; 42).  Bollinger testified that he did not inform Petitioner that the voluntary intoxication was not a legal defense because "I didn't even know it wasn't at the time, so I know I didn't advise him, because I didn't know that it was abolished."  (*Id.* at 42).

> Q.  And did you personally feel as though you wanted to continue to move forward because of your rapport with the jury?
>
> A.  Yeah.  In these cases, in all my trials, I always bring my dad.  My dad is not an attorney, and he usually sits in the audience.  And I don't usually tell him about my cases.  I just let him show up, and I talk to him during the breaks, because he doesn't really know the law.  He just hears what the jurors are hearing.
>
> And so I would go out every now and then, and I remember going and telling my dad that I messed this up.  And he was like, Well, it sounds good to me, sounds like you're doing all right.  So I sort of listened, because he's sort of a seventh juror, so to speak.
>
> So I had a feeling like, well, maybe I can do enough smoke and mirrors here that I can still pull this off, because I didn't want to get a mistrial.  I didn't want to go that route.

(*Id.* at 35-36).[16]

In companion decisions the Supreme Court recently held that the Sixth Amendment right to effective assistance of counsel extends to plea negotiations. *Missouri v. Frye*, 132 S. Ct. 1399, 1404-08 (2012); *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). Thus, criminal defendants are "entitled to the effective assistance of competent counsel" during plea negotiations. *Lafler*, 132 S. Ct. at 1384 (internal quotation marks omitted). The Court also considered how to apply the prejudice prong of the ineffective assistance of counsel test set forth in *Strickland* and concluded that, in order to show prejudice, a defendant must demonstrate a reasonable probability that: (1) he would have accepted a plea offer but for counsel's ineffective assistance; (2) the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it; and (3) the plea would have resulted in a lesser charge or a lower

---

[16] At the evidentiary hearing Brian Kelley testified that in his opinion Bollinger did not seem surprised when he moved for a jury instruction that voluntary intoxication was not a proper defense. (*Id.* at 58).  Kelley testified that Petitioner's trial is the only one he tried with Bollinger, but he knew him to be a competent attorney.  (*Id.* at 61).  In Kelley's opinion he could not believe that Bollinger did not know that the defense had been abolished for at least five or six years.  He thought that Bollinger was trying to backdoor the defenses of voluntary intoxication and insanity, explaining, "frankly, you know, there was no reason to waive his–or to preserve his opening argument unless he was trying to backdoor something. I mean, if he had thought voluntary intoxication was a defense, he would have raised it in his opening argument when we presented them, instead of waiting until after the State's case."  (*Id.* at 60). Kelley concluded, "I think he was just stuck with a bad case that didn't really have a legal defense and did his best to backdoor something that wasn't a defense."  (*Id.* at 61).

sentence. *Id.* at 1384–85; *Frye*, 132 S. Ct. at 1409 ("To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time."); *see Glover v. United States*, 531 U.S. 198, 203 (2001) ("[A]ny amount of [additional] jail time has Sixth Amendment significance"). If after an evidentiary hearing, the defendant has made such a showing, a court "may exercise discretion in determining whether the defendant should receive the term of imprisonment the government offered in the plea, the sentence he received at trial, or something in between." *Lafler*, 132 S. Ct. at 1389.

Pursuant to Florida Statutes, § 775.051 (1999), effective October 1, 1999, "[v]oluntary intoxication resulting from the consumption, injection, or other use of alcohol or other controlled substance as described in chapter 893 is not a defense to any offense proscribed by law."  Additionally, this section held that "voluntary intoxication is not admissible to show that the defendant lacked the specific intent to commit an offense . . . ."  Petitioner was arrested in July of 2003, and his trial occurred in May of 2005.  Bollinger testified that he did not know that voluntary intoxication had been abolished as a defense at the time of trial and, consequently, this was the defense that he chose to pursue at trial. The Court finds that Bollinger rendered ineffective assistance of counsel in proceeding to trial on a defense which had been abolished five years before Petitioner's trial, thereby effectively leaving Petitioner with no defense. Bollinger's failure to know that the law had changed meant that he did not understand the importance of the plea negotiations and, thus, he gave Petitioner the detrimental advice to reject the plea offer.[17]  "The failure of an attorney to inform his client of the relevant law clearly satisfies the first prong of the *Strickland* analysis ... as such an omission cannot be said to fall within 'the wide range of professionally competent assistance' demanded by the Sixth Amendment." *Hill v. Lockhart*, 474 U.S. 52, 62 (1985) (White, J., concurring) (quoting *Strickland*, 466 U.S. at 690). *See also Bauder v.*

---

[17] For purposes of this claim, the Court finds that the final pretrial plea offered to Petitioner was twelve years.

*Fla., Dep't. of Corr.*, 619 F.3d 1272 (11th Cir. 2010)(holding counsel provided deficient performance by affirmatively representing that defendant would not be exposing himself to civil commitment past his sentence were he to plead guilty to charge of aggravated stalking); *Finch v. Vaughn*, 67 F.3d 909, 915-16 (11th Cir.1995) (holding counsel's misrepresentation that the defendant's state sentence would be served concurrently with his federal sentence constituted erroneous advice and ineffective assistance of counsel); *Beckham v. Wainwright*, 639 F.2d 262, 267 (5th Cir.1981) (holding counsel's misrepresentation that the defendant could only be sentenced to five years incarceration on withdrawal of his guilty plea fell "outside of the range of competence of attorneys in criminal cases") (internal quotations omitted)).

The result of Bollinger's deficient performance is that Petitioner rejected the pretrial plea offer, conceded guilt on the possession of cocaine and paraphernalia charges and was sentenced to thirty years imprisonment.  Respondent's argument is that Petitioner cannot demonstrate prejudice in relation to this claim because he knew before trial that voluntary intoxication was not a valid defense based on  handwritten admissions in his correspondence with the Harper firm.  The Court finds, however, the testimony of Bollinger and Petitioner credible on the issue and concludes that neither Bollinger or Petitioner knew that voluntary intoxication had been abolished as a defense prior to trial.[18]  Moreover, testimony taken at the evidentiary hearing  demonstrates that Petitioner has established prejudice under *Lafler* with regard to this claim. With regard to the first factor, Petitioner testified that he would have accepted the pretrial plea offer if he had known that voluntary intoxication was no longer a valid defense. Notwithstanding the fact that Petitioner believed that the plea offer was ten years, he testified that he would have accepted twelve years if he had known that he had no defense to the charges. Additionally, Bollinger testified that he would have advised Petitioner to accept the plea offer if he had known about the change in law because there was no other defense to the charges. With regard to the second factor, both Bollinger and Kelley

_____

[18] The Court acknowledges that Petitioner has been convicted of sixteen felonies and one charge of petty theft (*see* EH at 133); however, the Court finds that Petitioner is credible as to this fact.

testified that they believed the trial court would have accepted a stipulated plea in this case, and that in their respective experiences, the trial court had never rejected a stipulated plea.[19]  Finally, Petitioner has established that the plea would have resulted in a lower sentence.  Petitioner was sentenced to thirty years on these charges.  If he had accepted the last plea offer, he would have been sentenced to twelve years.

Accordingly, Petitioner has demonstrated both the deficient performance and the prejudice required by *Strickland* with respect to this claim.  Therefore, Petitioner is entitled to habeas relief on this ground.

Ground Two:        Ineffective Assistance/ Failure to Investigate Mental Heath Issues

Petitioner alleges that Bollinger was ineffective for failing to investigate evidence of his mental health issues prior to the trial.  (Doc. 22 at 23-27).  Respondent argues that this claim is procedurally barred because Petitioner's claim in his state court postconviction proceedings centered on the failure to investigate insanity rather than the failure to investigate mental issues.  Respondent argues in the alternative that the claim is without merit.  (Doc. 35 at 50-55).  Petitioner did not address Respondent's failure to exhaust argument in his reply.  (*See* doc. 41 at 9-10).

1.    State Court Proceedings

The record shows that Petitioner exhausted this claim in his first state postconviction proceeding.  The postconviction court cited the issue as an ineffective assistance claim, specifically the "failure to investigate prior to trial, evidence of the defendant's mental health issues."  (Order Denying Motion for Postconviction Relief ("Postconviction Order"), doc. 35-5 at 110, Exhibit U).  As to this claim, the postconviction court denied relief, holding as follows:

> As to sub-claim one, the defendant claims that trial counsel should have investigated the defendant's mental health issues and recognized there

---

[19] Kelley testified that he does not believe that Judge Sirmons would have turned down a plea of twelve or thirteen years in prison. Kelley stated that he never observed Judge Sirmons reject a plea that was stipulated to by both parties.  He explained, "[k]eep in mind I practiced in front of him for several years as a prosecutor and handled quite a few cases.  He was very hands-off as a judge.  If we were able to work out a resolution of the case, he generally didn't involve himself in them any further than need be." (EH at 51).

was a valid insanity defense available so that trial counsel would have filed
the appropriate notice to rely upon the insanity defense at trial.  However,
the evidence and testimony presented by the defendant in support of this
sub-claim does not establish that there was a valid insanity defense for
counsel to pursue.  The defendant had been shot five times by Panama
City police officers in 1991 during a lengthy high speed chase and spent
21 to 28 days in the hospital.  In 1992 and 1993, the defendant saw Dr.
Theron Colvin who diagnosed the defendant as suffering from Post-
Traumatic Stress Disorder (PTSD).  However, the defendant did not see
any other mental health professionals since 1993 and was not taking
medication or receiving any follow-up treatment after seeing Dr. Colvin
prior to the instant offense.  The defendant had other law violations that he
was charged with and went to trial after Dr. Colvin's diagnosis in 1993.  At
no time during the prosecution of those cases did the defendant rely on an
insanity defense.  The Court also finds the testimony offered by Dr. Sean
Stevens is not credible as to the defendant being insane at the time of the
instant offense.  Dr. Stevens was a personal family friend of the defendant
and the defendant's mother.  The defendant's mother was also a patient of
Dr. Stevens and it was Dr. Stevens who initiated the contact with the
defendant and counseled the defendant as a friend and not a patient.
Furthermore, Dr. Stevens only had one face to face visit with the
defendant and had never performed any psychological testing on the
defendant himself.  Specifically, Dr. Stevens did not perform an MMPI test
or a California Personality Inventory Test on the defendant which Dr.
Stevens testified were basic foundational level evaluative tools to
determine if the defendant was insane at the time of the offense.  The only
basis for Dr. Steven's opinions were the result of his correspondence and
communications with the defendant and his review of Dr. Colvin's affidavit
and the affidavit of the defendant's mother.  The Court also notes that Dr.
Colvin's affidavit does not address the issue of the defendant's mental
state at the time of the instant offense nor does he express an opinion that
the defendant met the legal standard for insanity at the time of the instant
offense.  Dr. Colvin's affidavit essentially establishes that the defendant
suffered form PTSD in 1991 and 1993 as a result of the 1991 shooting.
The fact that the defendant suffered from PTSD in 1993 does not support
a finding that the defendant was insane in 2003 when this offense
occurred.
Furthermore, there was also credible evidence available to show the
defendant had a history of extensive cocaine use which was not
addressed by Dr. Colvin's affidavit or by Dr. Steven's testimony.  There is
nothing to show whether the defendant's extensive cocaine use accounted
for the symptoms the defendant exhibited at the time of the offense.
Insanity must be proved by the defendant by clear and convincing

evidence.  Florida Statute  § 775.027.  In *Woodward v. State*, 992 So. 2d 391, 393 (Fla. 1st DCA 2008) the Court stated:

> "At the [postconviction evidentiary] hearing below, appellant failed to present any medical records or expert testimony to support the claim that his trial attorney was ineffective for failing to pursue an insanity defense based on appellant's long-term use of intoxicants.  Expert testimony would be necessary to establish such a defense.  Without medical records or expert testimony to support his claim that trial counsel should have pursued a defense based on appellant's intoxicant-induced insanity at the time of his alleged offenses, appellant could not demonstrate any entitlement to relief on this issue during the evidentiary hearing."

Because the defendant has not supplied sufficient credible evidence to support his claim that trial counsel should have pursued an insanity defense the defendant is not entitled to relief on sub-claim one.

(Postconviction Order, doc. 35-5 at 133-35 (citation to evidentiary transcript omitted)).

2.      Clearly Established Supreme Court Law

The standards for evaluating claims of ineffective assistance are set forth *supra*.

3.      Federal Review of Claim

Petitioner alleges that because his counsel did not investigate his mental health and/or insanity issues before trial, he failed to file the required notice of intent to raise an insanity defense.  Therefore, Petitioner could not rely on an insanity defense at trial.  At the April 27, 2010, 3.850 evidentiary hearing, Petitioner testified that after a 1991 incident in which he was shot five times by Panama City police, he met with a family friend who was a psychologist, Dr. Theron Covin, who practiced in Alabama. (Evidentiary Hearing ("EH I") at 507, *see* doc. 35-3 at 352).  Petitioner explained why he saw Dr. Covin as follows:

> Well, obviously after I was shot I had severe physical problems.  But then later on I started finding that I was having emotional problems.  I didn't want to leave the house, I was having nightmares, flashbacks of the incident all the time.  Sometimes I would have blackouts that the doctor termed them as daymares.  I would get startled for no reason.  I was just, I couldn't, I couldn't keep a job, I was just having a hard time coping with things and I really didn't understand why.

(*Id.*).  Petitioner testified that "occasionally . . . intense fear would come upon me and I think that was part of why sometimes I just didn't even want to leave the house."  (*Id.*)  In 1997, Petitioner was shot three times in the back by a Bay County sheriff's deputy who shot thirteen rounds at his car.  When Petitioner met with Bollinger he told him that he had been diagnosed with PTSD by Dr. Covin and informed him of the emotional problems he had when he saw law enforcement.  (*Id.* at 508-09).  Petitioner asked that a psychologist be hired to come see him in jail, but Bollinger did not arrange for this as requested.  As to whether his symptoms exacerbated from 1991 until 1997, Petitioner testified:

> From '91 after I saw Dr. Covin they became less frequent, they kind of just come when they want to but.  The nightmares, the trouble sleeping got further and further away.  And then in '97 when I was shot it was a much more traumatic experience in '97 and after that I was very, I don't know what the word I'm looking for, but it was very traumatic.

(*Id.* at 509).  Petitioner testified that when he saw a police officer sometimes he would not have any reaction, sometimes he would shake and sweat profusely and sometimes he would just flee.  (*Id.* at 520).  The first time Petitioner heard about a possible insanity defense was after the State asked for an instruction that voluntary intoxication was not a defense to the crime charged, and Bollinger asked for an instruction on insanity.  (*Id.* at 517).  Bollinger had never discussed an insanity defense with Petitioner.  (*Id.* at 517; 521).

On cross-examination, Petitioner admitted that during the time after the 1991 shooting when he was experiencing the symptoms he had described, he was occasionally using cocaine.  (*Id.* at 529).  He also acknowledged that an insanity defense had not been explored in his 1997 fleeing and eluding and aggravated battery against a police officer charges, although he did explain his fear of law enforcement to his attorney at the time.  (*Id.* at 535).  Petitioner testified that he saw Dr. Covin in 1992 and 1993, then he moved to Panama City and did not see him again.  (*Id.* at 541-42).  Petitioner also testified that he had not seen any other mental health professionals since 2003.  Petitioner testified that while he continued to experience symptoms of PTSD, he

did not try to get any psychological treatment because it was financially impossible, and he did not discuss the matter with his family because he did not want put a financial burden on them.  (*Id.* at 544).  Petitioner admitted that he continued to use cocaine, but he did not consider the possibility that the drug use was causing his problems with "daymares" or nightmares.  On redirect examination, Petitioner testified that he exhibited symptoms of PTSD even when he was not using any controlled substances. (*Id.* at 534-44).

Petitioner called Dr. Sean Stevens, a clinical psychologist, to testify at the hearing.  Dr. Stevens testified that in his professional opinion Petitioner suffered from PTSD at the time of the instant crime.  (*Id.* at 600).  In forming his opinion, Dr. Stevens reviewed Dr. Covin's report which included symptoms which are consistent with a diagnosis of PTSD.  Dr. Stevens also interviewed Petitioner and reviewed the trial transcripts and witness accounts of the crime.  Dr. Stevens testified that at the time of the crime Petitioner "would have been so frightened and disoriented that he wouldn't have been aware of what he was doing or the consequences of what he was doing." (*Id.* at 601).

On cross-examination, Dr. Stevens testified that he had been corresponding with Petitioner for four or five years and that Petitioner's mother, Mrs. Sabatine, was one of his patients.  In the course of his treatment with Mrs. Sabatine, Dr. Stevens learned about Petitioner's legal situation.  (*Id.* at 604-07).  However, Dr. Stevens contacted Petitioner on his own, not at the request of Mrs. Sabatine.  (*Id.* at 608).  He visited Petitioner once in prison in November 2008.  Dr. Stevens testified that he wrote Petitioner nine or ten letters and Petitioner wrote him probably fifteen times.  (*Id.* at 610).  Dr. Stevens testified that his letters were meant to encourage Petitioner, but he did not ask any in depth questions about why he was in prison or the difficulties he may have experienced there, and he did not offer Petitioner any advice.  (*Id.*).  Dr. Stevens testified that Petitioner is not a patient and he did not counsel him, but was corresponding with him more as a friend.  (*Id.* at 613).  Dr. Stevens did not give Petitioner any psychological evaluation or perform any psychological testing.  (*Id.* at

614).

Dr. Stevens also testified that he reviewed an affidavit prepared by Dr. Covin which was provided to him by Mrs. Sabatine.  In this affidavit, Dr. Covin described several sessions of therapy with Petitioner, which Dr. Stevens thinks meant three or four therapy sessions.  (*Id.* at 617).  Dr. Stevens testified that this affidavit helped him form his opinion that Petitioner suffered from PTSD in addition to the letters written by Petitioner.[20]

Dr. Stevens resumed his testimony when the evidentiary hearing continued on August 27, 2010.  Dr. Stevens testified that he did not review Dr. Covin's medical records or progress notes as to Petitioner's treatment. (Evidentiary Hearing ("EH II") at 645; *see* doc. 35-4 at 89).  Dr. Stevens did not give Petitioner a MMPI or a California Personality Inventory Test.  (*Id.* at 646-47).  Dr. Stevens clarified that after the hearing he recalled that he actually met with Petitioner twice, once at Thanksgiving in 2008 and once the following spring.  (*Id.* at 653).  On redirect examination, Dr. Stevens testified that psychological testing is not necessary to diagnose someone with PTSD.  (*Id.* at 658).  Dr. Stevens also testified that in diagnosing Petitioner he relied on some information from Petitioner's mother, including correspondence between her and Petitioner, and that his correspondence with Petitioner was not a major component in forming his opinion.[21]  On recross-examination, Dr. Stevens testified that he did not discuss the circumstances of Petitioner having been shot by law enforcement nor did he discuss his use of cocaine.  (*Id.* at 673).  When asked if cocaine could have been a factor if Petitioner had used cocaine for many years, Dr. Stevens responded that it certainly would be a factor.  (*Id.* at 673-74).

Ben Bollinger was also a witness at the August 2010 evidentiary hearing.  He testified that he could not recall Petitioner ever telling him that he suffered from PTSD or

---

[20] The April 3.850 hearing was suspended to give the State the opportunity to review the affidavit and correspondence which Dr. Stevens used in forming his opinion.

[21] The record indicates that the letters were redacted prior to being given to the State to review. (EH II at 648).

that he had been in any psychological counseling.  (*Id.* at 721-22).  Bollinger did not recall Petitioner asking to see a psychologist or a psychiatrist.  (*Id.* at 723).  Bollinger did not recall any communication with Petitioner's mother that indicated that Petitioner had any type of mental deficiency nor did he have any communication with Dr. Covin.  (*Id.* at 724).  He only learned of these issues after the trial.  When testifying about the mistrial issue which arose during trial, the following exchange occurred:

> Bollinger: We were in the middle of the trial and some of the testimony, I think it was from Officer Finch maybe stated whenever he went up to draw his weapon or something he had this crazed look in his eye.
> Assistant State Attorney Peacock: Talking about Kevin Sullivan had a crazed look?
> Bollinger: Yes, Mr. Sullivan had this crazed look in his eye and he, and for some reason I don't know somebody said he was insane or crazy or something, so I started thinking to myself, okay, well we will just go along with that theory too, you know.  So we started going through that.  And I think maybe Mr. Kelley objected or something because I kept using the word "insanity" and things of that nature. . .

(*Id.* at 728-29).  Bollinger testified that the thought that there might be an insanity issue first came to his knowledge during trial when the law enforcement officer testified.  (*Id.* at 730).

On cross-examination, Bollinger testified that while he knew about Petitioner having been shot in 1991, he did not know what PTSD was until after the trial.  (*Id.* at 737).  At sentencing Bollinger presented Petitioner's stepfather to testify to this condition.  Bollinger had never dealt with an insanity issue which is why he did not file the proper notices.  Bollinger testified that he had a very good relationship with Petitioner, that he found him to be very honest, bright and very involved in the case.  (*Id.* at 738-39).  When asked if he recalled any discussions about mental health issues, Bollinger testified, "I know we talked a lot about his cocaine usage but not any, I don't remember any mental health other than he hated cops, and you know, things of that nature."  (*Id.* at 740-41).  Bollinger testified, however, that he would not dispute it if Petitioner stated that they had discussed his mental health issues.

Petitioner argues that Bollinger should also have been aware of the possibility of

an insanity defense prior to trial because the "use of force" form that law enforcement officers filled out stated that Petitioner was "mentally deranged" at the time of the incident.  Petitioner argues that had Bollinger properly investigated the case, he would have complied with Rule 3.216 and filed to proper notice to rely on insanity defense; that he would have obtained the services of Dr. Stevens or Dr. Covin; and that he would have presented a valid defense at trial.

The postconviction court rejected Dr. Stevens's opinion that Petitioner was insane at the time of the offense based on an assessment of his credibility.  A federal habeas court cannot redetermine the credibility of witnesses whose testimony had been observed by a state trial court.  *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)("28 U.S.C. §2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *Consalvo v. Sec'y, Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011)("Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review.").   Additionally, the record supports the postconviction court's findings.  Dr. Stevens never treated Petitioner professionally or conducted any psychological testing of Petitioner.  Furthermore, Dr. Stevens did not review Dr. Covin's treatment records or any other medical records related to the issue.  Finally, and significantly, Dr. Stevens did not account for Petitioner's lengthy history of cocaine use in giving his opinion that Petitioner was insane when he committed the offense.

Bollinger testified at the evidentiary hearing that he did not recall Petitioner discussing any mental health issues with him and did not recall Petitioner asking to see a psychologist in jail.  Given Bollinger's description of Petitioner as very bright and very involved in his case, it was not unreasonable for Bollinger to fail to pursue a defense about which he did not have any information.  While Petitioner contends that the "use of force" form and other witnesses described him as looking mentally deranged, it was not unreasonable for Bollinger to conclude that these symptoms were the result of Petitioner' cocaine use at the time rather than signs of mental illness or insanity.

Additionally, because Petitioner had not seen any mental health professionals for at least ten years before the 2003 offense, it was unlikely that Bollinger could have discovered this line of defense without information from Petitioner or his family. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information."  *Strickland*, 466 U.S. at 691.  "[E]vidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims." *Chandler*, *supra*, 218 F.3d at 1318.  The Eleventh Circuit has also noted that "[t]he broader point is that *Strickland* claims are meaningless without context. '[T]rial lawyers, in every case, could have done something more or something different,' and 'omissions are inevitable.' Whether those omissions are reasonable is a contextual inquiry, turning on the options realistically available to the attorneys, and their reasons for picking some options over others.*" Debruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1282 (11th Cir. 2014)(citation to *Chandler* omitted).

Petitioner contends that the state court's decision was contrary to and an unreasonable application of *Strickland*.[22]  However, Petitioner has not demonstrated that his trial counsel was deficient in failing to investigate an insanity defense.  Petitioner testified that he informed Bollinger about his PTSD diagnosis, but Bollinger testified consistently that he had no recollection that they ever discussed this.  While the postconviction court did not made a credibility determination with respect to this point, there is no other clear evidence in the record that Bollinger knew or should have known

---

[22] The postconviction court denied relief, and the First District Court of Appeal *per curiam* affirmed.  The First District's determination is entitled to AEDPA deference.  *See Shelton v. Sec'y, Dep't of Corr.*, 691 F.3d 1348, 1352 (11th Cir. 2012) (holding that a state court's per curiam decision with no written opinion is an adjudication on the merits entitled to AEDPA deference); *see also Bishop v. Warden*, *GDCP*, 726 F.3d 1243, 1255 (11th Cir. 2013)("It is by now abundantly clear that AEDPA deference applies to summary dispositions of a state court, because '§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.' ") (quoting *Harrington*, *supra*, 562 U.S. at 99); *accord id.* at 98 ("There is no text in the statute requiring a statement of reasons.").

that Petitioner had any mental health issues which would have led a reasonable attorney to investigate further.  While Petitioner notes the "use of force" form and the failure of the hospital to admit him, Bollinger could reasonably have determined that the symptoms  Petitioner exhibited at his arrest were due to the cocaine use at the time of the offense.  Additionally, even if Bollinger had known that ten years prior to the crime Petitioner had been diagnosed with PTSD, establishing insanity is a high bar.

Petitioner also cannot establish prejudice under *Strickland* with respect to this claim.  The postconviction court found that Petitioner had not established that he had a valid insanity defense.  The court discredited Dr. Stevens's opinion because he relied on correspondence and communications with Petitioner, whom he did not counsel as a patient, and Dr. Colvin's affidavit, which did not contain facts which would tend to show that Petitioner was insane at the time of the offense.  Furthermore, Dr. Stevens did not perform any psychological testing on Petitioner.  Thus, Petitioner did not present any medical records or expert testimony establishing that he had a valid insanity defense. The record supports these findings.  Therefore, even if Bollinger had investigated this avenue of defense, it is not likely that he would have been able to establish that Petitioner was insane at the time of the offense by clear and convincing evidence.  It is noteworthy that postconviction counsel, who had years to develop evidence of insanity, were also  unable to make the sufficient showing.

 Given the foregoing, Petitioner has failed to demonstrate that the state court's ruling was contrary to or an unreasonable application of *Strickland*.  Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground Three:        Ineffective Assistance of Counsel/ Mistrial Option

Petitioner alleges that his trial counsel was ineffective for improperly advising him to waive the trial court's offer of a mistrial. (Doc. 22 at 27-38).

1.        State Court Proceedings

Petitioner exhausted this claim in his state court proceedings.  The postconviction court denied the claim, holding as follows:

[T]he defendant claims his trial counsel gave him improper advice in

getting the defendant to waive the Court mistrial invitation.  The defendant argues trial counsel's reason for turning down the mistrial was based upon a misunderstanding of the law and was therefore unreasonable. Furthermore, the defendant claims that if he had been told that voluntary intoxication was not a defense, he would have accepted the ten year plea offer by the State.  In addition, the defendant claims a mistrial would have allowed the defendant to more fully investigate the insanity defense. However, as again noted previously, the defendant has failed to establish the existence of a potentially valid insanity defense in this case.  At the evidentiary hearing, trial counsel testified his reason for recommending the defendant decline the mistrial offer was:

> I knew Mr. Kelley [Brian Kelley, the prosecuting ASA] had messed up in the trial.  There was, as we know, Mr. Sullivan had several fleeing and eluding charges in the past dating back to the early Nineties and we had this *Williams* Rule. And I know that Mr. Kelley had messed up and didn't provide me notice like I didn't provide him notice with insanity.  And I knew, in my thought process, man, we get this mistrial, Brian, Mr. Kelley, knows he's messed this up, we're going to get hit with the *Williams* Rule and we're done.

In response to the defendant pointing out that the State had timely filed a *Williams* Rule notice and that trial counsel had filed a Motion in Limine to exclude the *Williams* Rule evidence, trial counsel testified:

> No, I still think that was coming up in my mind for some reason because I know there was something in there that bothered me.  I don't know what it is.  And again, I don't want to confuse these cases because I know we had the first case too. [The 2001 fleeing and eluding case in which Mr. Bollinger represented the defendant and the defendant was acquitted.] There is just something that sticks out in my mind about that.

The record reflects that at the beginning of the trial, trial counsel announced that he and the State had agreed that the State would not seek to put any *Williams* Rule evidence in as part of its case in chief but would be able to introduce it in rebuttal if the defense opened the door. Based upon this agreement, the Court was never called upon to rule on the defendant's Motion in Limine.  As a matter of trial strategy, it appears trial counsel may have avoided a bullet when the prosecution agreed not to pursue his *Williams* Rule notice without even waiting for an adverse

ruling by the Court on the Motion in Limine, and that it was reasonable for trial counsel to feel he may not be so lucky a second time around. Therefore, trial counsel's concern that evidence of other fleeing and eluding's could come in at a subsequent trial if he accepted the mistrial offer and his assessment that such evidence would be particularly damaging to the defendant's case was not unreasonable.  Strategic decisions do not constitute ineffective assistance of counsel if alternate courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.  Although trial counsel misunderstood the availability of voluntary intoxication as a defense, there was no other valid defense available at the time of the mistrial offer and it was not unreasonable for trial counsel to be concerned about the possible admission of the additional incriminating evidence requested by the State in the *Williams* Rule notice should there be a new trial.  Finally, there has been no showing that the Court would have granted the Motion in Limine that was filed by trial counsel.  At this point, it is pure speculation as to if trial counsel would have been successful in keeping out the *Williams* Rule evidence as requested in his Motion in Limine.  By entering into the agreement with the State, trial counsel was successful in avoiding the possibility of an adverse ruling by the Court. The defendant is not entitled to relief as to [this ground].

(Postconviction Order, doc. 35-5 at 136-37 (citations omitted)).

    2.    Clearly Established Supreme Court Law

The legal standards as to ineffective assistance of counsel are discussed *supra*.

    3.    Federal Review of Claim

The trial record reflects that during the charge conference after the State rested, Bollinger asked for an insanity instruction "being that the State's witnesses have stated that [Petitioner] was not in his right mind or in the right world and would ask that you read that insanity defense since that has become an issue."  (Doc. 35-1 at 335).  Kelley argued that proper notice to rely upon insanity had not been provided.  The trial court then read portions of Rule 3.216 for the parties.[23]  Bollinger then responded:

---

[23] Fla. R. of Crim. P. 3.216 (2005) provided in relevant part as follows:

(b) Notice of Intent to Rely on Insanity Defense. When in any criminal case it shall be the intention of the defendant to rely on the defense of insanity either at trial or probation or community control violation hearing, no evidence offered by the defendant for the purpose of establishing that defense shall be admitted in the case unless advance notice in writing

Your Honor, if I could be heard on that real quick before you make a
ruling?  Your Honor, that [rule] goes to his competency and this is not a
defense we have to prove.  If you will actually read 3.6A it says there that
in determining the issue of insanity, you may consider the testimony of
expert and nonexpert [ ] witnesses.  The question you must answer is not
whether the defendant is insane today or has ever been insane but simply
that he was insane at the time of the crime alleged committed.  Now if we
were just dealing with the use of force complaint and the mentally
deranged checkmark, you know, then there might be notice there, I had no
idea this case was going to go this way and we have had witnesses up
here expand on that and say basically he had a crazed look.  All of the
witnesses say that and that he was not in this world, so this is not going as
to his competency, it's going to his sanity at the time, which is up to the
jury, Your Honor, and this instruction should be read because we had no
knowledge, I just say that on the report and asked the officer about it and
he expanded on it so this is different than a competency issue, the rule
you are reading.

(*Id.* at 337-38).  Judge Sirmons clarified that he was reading the rule on insanity, and

Bollinger argued that an expert witness was not necessary unless the defense knew

ahead of trial that insanity could be an issue.  The trial court replied:

---

of the defense shall have been given by the defendant as hereinafter provided.

(c) Time for Filing Notice. The defendant shall give notice of intent to rely on the defense
of insanity no later than 15 days after the arraignment or the filing of a written plea of not
guilty in the case when the defense of insanity is to be relied on at trial or no later than 15
days after being brought before the appropriate court to answer to the allegations in a
violation of probation or community control proceeding. If counsel for the defendant shall
have reasonable grounds to believe that the defendant may be incompetent to proceed,
the notice shall be given at the same time that the motion for examination into the
defendant's competence is filed. The notice shall contain a statement of particulars
showing the nature of the insanity the defendant expects to prove and the names and
addresses of the witnesses by whom the defendant expects to show insanity, insofar as is
possible.

(d) Court Appointed Experts. On the filing of such notice the court may on its own motion,
and shall on motion of the state or the defendant, order that the defendant be examined
by no more than 3 nor fewer than 2 disinterested, qualified experts as to the sanity or
insanity of the defendant at the time of the commission of the alleged offense or probation
or community control violation. Attorneys for the state and defendant may be present at
the examination. The examination should take place at the same time as the examination
into the competence of the defendant to proceed, if the issue of competence has been
raised.

Well, I would say in the 28 years I have been trying cases, I have not seen an insanity defense arise on the day of trial and the Court instruct the jury on an insanity defense without it being raised either by notice and the Court having appointed the experts to evaluate the Defendant . . . . now if the trial, the rule does provide, if the trial was already commenced, the Court only on motion of the defendant may declare a mistrial in order to permit the defendant to raise the defense of insanity pursuant to the rule. Any motion for mistrial shall constitute a waiver of the defendant's right to any claim of former jeopardy arising from the uncompleted trial.   So, there is the option that if you choose to do that, you can raise that under the rule on 3.216(h) which is the waiver of the time to file.

(*Id.* at 338-39).[24]  The record reflects that the following then transpired:

Bollinger: We will waive that, Your Honor.  I have talked to the Defendant and we waive asking for a mistrial, so–
The Court: Okay.  You understand, Mr. Sullivan, if you chose to do so, you could ask the Court to declare a mistrial and allow you to file notice of intent to rely on insanity, then the Court would then follow the rules in terms of having experts appointed and reporting back to the Court and allow to you go forward on the defense of insanity at the time of the offense?
The Defendant: Yes, Your Honor, I understand that.
The Court: Are you agreeing that Mr. Bollinger does not have to file a motion for mistrial at this time.  You are ready to go forward without the insanity defense?
Bollinger: Yes, sir, Your Honor, I am ready to go forward.

(*Id.* at 339-40).

At the April 2010 evidentiary hearing, Petitioner testified that the issue of insanity did not arise during the State's case, that Bollinger only asked the witnesses if he appeared intoxicated.  (EH Vol. I at 514-15).  Petitioner testified that the issue came up during the discussion about jury instructions:

---

[24] Rule 3.216(h) provided: "On good cause shown for the omission of the notice of intent to rely on the defense of insanity, or any mental health defense, the court may in its discretion grant the defendant 10 days to comply with the notice requirement. If leave is granted and the defendant files the notice, the defendant is deemed unavailable to proceed. If the trial has already commenced, the court, only on motion of the defendant, may declare a mistrial in order to permit the defendant to raise the defense of insanity pursuant to this rule. Any motion for mistrial shall constitute a waiver of the defendant's right to any claim of former jeopardy arising from the uncompleted trial."

[Postconviction counsel] Pumphrey: At this point was there an opportunity or did Mr. Bollinger give you any advice as to whether to accept or decline a mistrial?

[Petitioner]: Yes.  Mr. Bollinger informed me to turn it down, that he felt, I can't exactly remember what he said about the trial itself but he told me to turn down the mistrial that the court was offering.

Q. And this is your attorney?

A. Correct.

Q. And were you relying on your attorney representation?

A. Yes, I was.  But I was concerned, if I can just expand a little bit, because when Brian Kelley had objected to the insanity instruction request and Your Honor, Judge Sirmons, read the rule in court regarding an insanity defense and it appeared to me that Mr. Bollinger didn't understand the rule correctly because Judge Sirmons was telling him that, as the state stated, that it had to be prior notice given prior to trial. And–

Q. When you say Mr. Bollinger didn't seem to understand the rule, is that something that you gleaned to this point?

A. That is something that, well, yes, I gleaned it from looking into the transcripts.  At the time I was confused myself because Ben was arguing that that wasn't necessary and Judge Sirmons was stating the rule that is was necessary.  So–

Q. Now at some point during this point Judge Sirmons inquires of you if this is what you want to do and you're waiving the mistrial?

A. Right.  Judge Sirmons says that he can't give the instruction but that he would offer a mistrial to the defense upon motion from the defense.

Q. And based upon what Mr. Bollinger had advised you did you accept the opportunity for a mistrial or decline it?

A. I declined it but I had told Ben first that I wanted to accept it, but he told me to decline it, which is what I did.

Q. So you told Mr. Bollinger to accept it but he said, no, you're going to decline it?

A. We were standing at the table when Judge Sirmons offered us the mistrial and I turned to Ben and specifically remember telling Ben we need to take this, things don't look like they are progressing properly.  And Ben said, no, I want you to waive the mistrial.  So, which is what I did.

(*Id.* at 517-19).   Petitioner testified that Bollinger did not discuss the insanity defense with him or explain its ramifications, but that the issue "came out of the blue," and the decision to reject the mistrial offer "was made in about 15 seconds."  (*Id.* at 521). When asked if Bollinger was adamant about not agreeing to a mistrial, Petitioner responded, "[y]es, he was.  And it even goes back to when we had that recess in the back room

when he came back there and I asked him to speak to Mr. Kelley about a plea if it was
still available and he was very, I wouldn't say agitated but he was in the heat of battle
type of thing and he said, no, don't give up on me now, we're going to trial." (*Id.* at 532).
Petitioner testified that in hindsight, after researching PTSD and insanity, he "absolutely"
would have accepted the mistrial offer.  (*Id.* at 522).   However, Petitioner acknowledged
that he understood prior to rejecting the mistrial that his voluntary intoxication defense
was gone.  Petitioner testified that he did not understand that by waiving the mistrial
offer he would not get an insanity instruction.  (*Id.* at 531).

　　　Bollinger testified at the August 2010 hearing that the issue of insanity arose at
trial when Officer Finch described Petitioner as having a "crazed look in his eye."  (EH
Vol. II at 728).  After the discussion of Rule 3.216, and the trial court's suggestion of a
mistrial option, Bollinger testified that he discussed the mistrial option with Petitioner:

> What I recall telling Mr. Sullivan is the judge has said we could have a
> mistrial because of some paperwork that I could file, you know, do you
> want a mistrial or, you know, it was something of that nature.  I don't
> specifically remember saying rule point-whatever it is, you know, makes
> us have to file this paperwork.  But I sort of generalized it as fast as I could
> because I think it was probably like, it was right in the middle of court.  It
> was five, ten seconds I probably talked to him about it.

(*Id.* at 731).  Bollinger could not recall whether Petitioner told him that he wanted a
mistrial or not.  When asked why he advised against asking for a mistrial, the following
exchange occurred:

> Bollinger: My basis and me remembering the facts of this case, and I know
> I didn't explain this to Mr. Sullivan at the time, I knew Mr. Kelley had
> messed up in the trial.  There was, as we know, Mr. Sullivan had several
> fleeing and eluding charges in the past dating back to the early Nineties
> and we had this *Williams* Rule.  And I know that Mr. Kelley had messed up
> and didn't provide me notice like I didn't provide him notice with insanity.
> And I knew, in my thought process, man, we get this mistrial, Brian, Mr.
> Kelley knows he's messed this up, we're going to get hit with the *Williams*
> Rule and we're done.
> [Assistant State Attorney] Peacock: The *Williams* Rule would not have
> helped you had you gone forward, would it?  The *Williams* Rule, if it were
> granted, that wouldn't have helped you at all?
> Bollinger: No, that would have probably sunk our boat.  I mean, it was

hard enough even, I mean, the News Herald was here, channel 7, channel 13, I mean, this was everywhere.  I was surprised the jury could not know what was going on in the outside world because it was a big, it was a big deal and I knew that if the next jury knew about these prior problems we were dead in the water.

* * * *

Peacock: You felt like the *Williams* Rule would be deadly at a later point for a future trial and you wanted to stay away from that?
Bollinger: Yes.

(*Id.* at 732-33).

On cross-examination, Bollinger testified that if the State had in fact filed a *Williams* Rule notice, thus indicating that Kelley had not neglected the issue, then he would have "very possibly" asked for a mistrial.  (*Id.* at 745).  Bollinger also testified that once the voluntary intoxication defense was precluded he "was trying to use, for lack of a better word, a hybrid type insanity-slash-intoxication and I was trying to make it up as I go at that time because, like I said, my preparation fell through the floor.  So I was just trying to gather what I could and hopefully, you know, with the two concessions of the cocaine and the paraphernalia, that they would convict him on that and not on the fleeing and eluding.  (*Id.* at 747-48).  When asked what occurred after the court mentioned the mistrial option, the following exchange occurred:

Pumphrey: And, but when you approached Mr. Sullivan did you instruct him we don't want a mistrial in this case?
Bollinger: Yeah, I think I told him, I didn't tell him the reasoning about the *Williams* Rule stuff but I know, I think I told him, I said we don't want a mistrial here.
Pumphrey: And you didn't really explain in depth about the ramifications of mistrial versus non-mistrial, you just said, hey, Kevin, we don't need a mistrial?
Bollinger: Everything was bam, bam, quick, I mean, I don't know if the jury was still sitting but we were right there, I mean, it was in the heat of battle so.

(*Id.* at 748-49).  Bollinger did not recall Petitioner telling him that he wanted a mistrial, but he does not dispute the point if Petitioner says otherwise.  As to the hybrid defense he was trying to use, Bollinger explained that he "was trying to smoke screen the jury

and put the dog and pony show on them and hopefully they were latching on to him smoking crack cocaine and split the baby with me." (*Id.* at 750).  Bollinger testified that when the trial court told the jury that voluntary intoxication was not a defense, he "was hoping–most jurors, you know, when the judge is reading jury instructions you can tell a lot of them are half in, half out, especially that was sort of stuck in the middle, so I was hoping it would just sort of gloss over that is what I was hoping." (*Id.* at 751).  When asked if he was trying to backdoor the insanity defense, Bollinger testified that he "was trying to come up with different words for it, I think.  If I remember correctly, I wasn't, because the judge was shutting me down or Mr. Kelley was objecting to the word "insanity" so I was trying to come up with different words, I think." (*Id.* at 753).[25]  As to the *Williams* Rule issue, postconviction counsel showed Bollinger that the record reflected that the State had filed notice of the *Williams* Rule and Bollinger had filed a motion in limine.  When asked if this changed his opinion as to the *Williams* Rule issue and the mistrial, Bollinger responded, "No, I still think that was coming up in my mind for some reason because I know there was something in there that just bothered me.  I don't know what it is.  And again, I don't want to confuse these cases because I know we had the first case too.  There is just something that sticks out in my mind about that." (*Id.* at 760-61).  Bollinger testified that he felt good about the jury.  He stated, "I thought the trial was going fine, I mean, opening went fine, our questioning of our witnesses, I remember Deputy Finch was a very good witness, actually a defense witness for us because he, I went into it with him a lot I think about the crazed look in his eyes and stuff so I thought things were going fairly well in the trial." (*Id.* at 761).  The following exchange also occurred:

> A. [Bollinger]: . . . and I do remember the judge giving a curative instruction about something.  I don't remember what it was but I remember Mr. Kelley objecting.  I don't know if he had objected to the voluntary intoxication or he had objected to the insanity but I do remember being shut down in closing on that and the judge giving some type of curative

---

[25] During his closing argument Bollinger described Petitioner as having a "crazed look on his face," "was mentally deranged."  (Doc. 35-1 at 362-63).

instruction.  And then I tried to come back and just keep spinning things.  I
do remember that.
Q. [Pumphrey]: Curative, not for you?
A. Not for me, it wasn't curative for me, that's for sure, or Mr. Sullivan.
Q. You would agree at that point it destroyed that theory?
A. Yes.
Q. It kind of cured any defect the state may have had, pretty much made
their case bullet proof?
A. I was going on charm then.
Q. Looking for a fire extinguisher.
A. Yeah.
Q. The knowledge you have now about insanity and voluntary intoxication,
would you have recommended Mr. Sullivan take a mistrial given those
circumstances?
A. Yes.
Q. And you say that without hesitation.  In your mind you believe you
should have advised him to take the mistrial and you should have
recommended a mistrial, correct?
A. You're talking about hindsight.
Q. I'm completely with you on hindsight?
A. Yes.
Q. It is the worst part about what we do in these type of motions is
Monday morning quarter-backing.  But you agree that by not moving for a
mistrial that prejudiced Mr. Sullivan in the possible outcome of his case?
A. Yes.

(*Id.* at 752).

The postconviction court held that "trial counsel's concern that evidence of other

fleeing and eluding's could come in at a subsequent trial if he accepted the mistrial offer

and his assessment that such evidence would be particularly damaging to the

defendant's case was not unreasonable."   (Postconviction Order, doc. 35-5 at 138).

While Petitioner posits that there is no reason to believe that the State would not

stipulate to keep out *Williams* Rule evidence in a second trial had Petitioner asked for a

mistrial, there is no evidence in the record that guarantees that this would have been

the case.  Bollinger's fear that he might not be able to keep this evidence out again was

not unreasonable under the circumstances.[26]  Further, the postconviction court

---

[26] Respondent notes that the State's *Williams* Rule evidence was not based on identity, so it was
not subject to a high threshold for admissibility. *See, e.g., Zack v. State*, 753 So. 2d 9 (Fla. 2000) (non-

specifically held that Petitioner had not made a showing that the court would have granted his motion in limine, and it is "pure speculation" at to whether Bollinger would have been able to keep out the *Williams* evidence in another trial.  (*Id.*).  Also, Bollinger testified that he felt that the trial was going well at the time, and he did not want to risk a second trial.   While Bollinger admitted that in hindsight, he should have asked for a mistrial, *Strickland* cautions against just this sort of speculation.   "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  *Strickland*, 466 U.S.  at 689.  Because the standard is an objective one, the fact that trial counsel, at a postconviction evidentiary hearing, admits that his performance was deficient matters little. *See Tarver v. Hopper*, 169 F.3d 710, 716 (11th Cir.1999) (noting that "admissions of deficient performance are not significant"); *see Atkins v. Singletary*, 965 F.2d 952, 960 (11th Cir.1992) ("[I]neffectiveness is a question which we must decide, [so] admissions of deficient performance by attorneys are not decisive.");  *see also Waters v. Thomas*, 46 F.3d 1506,1514 (11th Cir. 1995)(en banc) ("The widespread use of the tactic of attacking trial counsel by showing what 'might have been' proves that nothing is clearer than hindsight-except perhaps the rule that we will not judge trial counsel's performance through hindsight.").

It is true that Bollinger developed the insanity defense "on the fly" in reaction to comments made by witnesses during the trail and did not research the issue or understand the particulars of Rule 3.216.  Petitioner contends that a mistrial would have allowed him to pursue an insanity defense.  However, given that Petitioner was unable to demonstrate that he had a meritorious insanity defense, he cannot establish prejudice under *Strickland* with regard to this issue. Effective assistance under *Strickland* does not require the best lawyering, only that some reasonable lawyer could have conducted the trial in the same manner given the circumstances. Under the

---

similar evidence permitted under *Williams* rule when relevant to non-identity purpose of intent or to rebut self-defense and recognizing that "admissibility of other crimes evidence is not limited to crimes with similar facts").

circumstances, Petitioner has not demonstrated that the state court's determination was an unreasonable application of *Strickland.*

Finally while Petitioner argues that his waiver of an insanity defense must be knowing, intelligent and voluntary, the Supreme Court has not decided a case which stands for this proposition, and Petitioner cites none.  Therefore, Petitioner is not entitled to relief on this ground.  *See* § 28 U.S.C. 2254(d)(1); *see also Dombrowski v. Mingo*, 543 F.3d 1270, 1274 (11th Cir. 2008)( "when no Supreme Court precedent is on point, we have held that a state court's conclusion cannot be 'contrary to clearly established Federal law' ....")(quoting *Washington v. Crosby*, 324 F.3d 1263, 1265 (11th Cir. 2003)).

Given the foregoing, Petitioner has failed to demonstrate that the state court's ruling was contrary to or an unreasonable application of *Strickland*.  Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground Four: Ineffective Assistance of Counsel/ Failure to Present Any Defense

Petitioner alleges that his counsel was ineffective because he failed to present any defense to the jury. (Doc. 22 at 39-40).

1.      State Court Proceedings

Petitioner exhausted this claim in state court.  The postconviction court denied the claim, holding as follows:

> There is an old saying used by some trial attorneys concerning trial
> strategy in certain types of cases.  It goes "if you haven't got the law on
> your side, argue the facts and if the facts are not on your side, argue the
> law and if the facts and the law are both against you, just argue."  In the
> instant case, the defendant has failed to establish he had a potentially
> meritorious defense under the facts and the law in this case.  As
> previously noted, the defendant has failed to establish the existence of a
> potentially valid insanity defense at the time of the offense.  The Court
> also notes that defendant's trial counsel has represented the defendant
> during an earlier jury trial in 2001 under facts similar to the facts of this
> case.  No insanity defense was presented and no voluntary intoxication
> defense was offered in that case.  However, the defendant's trial counsel
> was successful in securing a not guilty verdict from the jury in that case.
> The record reflects trial counsel did the best he could have done given the

status of the law and the facts.

(Postconviction Order, doc. 35-5 at 137 (citation omitted)).

   2.     Clearly Established Supreme Court Law

   The legal standards as to ineffective assistance of counsel are discussed *supra*.

   3.     Federal Review of Claim

   Bollinger testified in the August 2010, 3.850 evidentiary hearing that during trial when it became clear that he could not argue his planned voluntary intoxication defense he tried to present a "hybrid type insanity-slash-intoxication" defense hoping that given his concession of the possession of cocaine and paraphernalia, the jury would convict Petitioner on those lesser charges and not convict on the more serious fleeing and eluding charges.  (EH II at 747-48). Bollinger explained that he was "trying to smoke screen the jury and put the dog and pony show on them and hopefully they were latching on to [Petitioner] smoking crack cocaine and split the baby with me." (*Id.* at 750).  Bollinger testified that he hoped the jurors would "gloss over" the fact that voluntary intoxication and insanity were not to be considered defenses because "when the judge is reading jury instructions you can tell a lot of [the jurors] are half in, half out, especially [since] that was sort of stuck in the middle." (*Id.* at 751).  Bollinger decided to "go[ ] on charm" once these defenses were shut down, and he did not feel any negative feelings coming from the jury during trial.

   To retain credibility, defense counsel must often make concessions that, viewed narrowly, may appear detrimental to the client's cause. The Supreme Court has acknowledged "[b]y candidly acknowledging [defense counsel's] client's shortcomings, counsel might ... buil[d] credibility with the jury and persuade it to focus on the relevant issues in the case." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (citation omitted). *See Florida v. Nixon*, 543 U.S. 175 (2004)(holding that defense counsel's failure to obtain defendant's express consent to a strategy of conceding guilt at the guilt phase of a capital trial did not automatically render counsel's performance deficient); *Darden v. United States*, 708 F.3d 1225, 1229-32 (11th Cir. 2013)(holding in a noncapital case that when counsel concedes a defendant's guilt as a tactical decision, designed to lead

jury towards leniency on other charges and to provide a basis for a later argument to the judge for a lighter sentence, such tactical retreat is deemed to be effective assistance). Under the circumstances, Petitioner has not demonstrated that the state court's denial of this claim is an unreasonable application of *Strickland. See Harrington v. Richter*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." (citations omitted)). "Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Johnson v. Sec'y, Fla. Dep't of Corr.*, 643 F.3d 907, 911 (11th Cir. 2011).

Given the foregoing, Petitioner has failed to demonstrate that the state court's ruling was contrary to or an unreasonable application of *Strickland*.  Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground Five: Trial Court Erred by Denying Petitioner's Motion to Recuse

Petitioner alleges that he had a well-grounded fear that he might not receive a fair sentencing hearing due to an alleged ex parte communication between the trial judge and prosecutor which he overheard during his trial, and that the trial judge erred in denying his subsequent motion to recuse.  (Doc. 22 at 40-45). Respondent alleges that this claim is procedurally defaulted because Petitioner failed to file his motion within the time required under Florida law, and he has not demonstrated cause and prejudice for the default.  In the alternative, Respondent argues that this claim is without merit.

1.    State Court Proceedings

On June 17, 2005, Petitioner filed a motion to recuse Judge Sirmons pursuant to Fla. R. Jud. Admin Rule 2.160 (now Rule 2.330) wherein Petitioner alleged that on the day of his trial, which was held on May 4, 2005, while he was being taken to the holding area during a recess after the State rested its case, he overheard Assistant State Attorney Kelley and Judge Sirmons mention his name.  Petitioner did not hear exactly what was said, but he heard his name "Mr. Sullivan" mentioned.  Petitioner did not inform his counsel about this communication until the sentencing hearing held on June

15.  (*See* doc. 35-2 at 181-82).  A hearing on the motion to recuse was held on June 29,

wherein Petitioner argued that he was concerned he would not receive a fair habitual

offender hearing or sentencing in his case.  Judge Sirmons denied the motion, ruling as

follows:

> Well, let me just say for the, for record purposes, the Court cannot
> comment on the truth or falsity of any allegations contained in a Motion to
> Recuse; the Court can just rule on its legal sufficiency.
>                                   * * *
> Having reviewed a number of these Motions to Recuse in the past in
> various situations and not commenting on the truth or falsity of the
> allegation, in, in reading the affidavit and the four corners, which the
> Court's required and confined to do, the actual motion is legally insufficient
> to state a grounds for the Court to recuse itself because the only allegation
> is the mention of the defendant's name, not anything to do with, other than
> the fact that his name was mentioned.
> The time scenario, the day of trial, during a recess, the reporting of it was
> on June the 15th, which, let's see, the trial was on . . . May 4th.  So if his
> name was mentioned on May the 4th during a recess during the course of
> the trial, it wasn't, Counsel, Defense Counsel, was obviously present
> during the trial, if there was a concern about improper communication, ex
> parte communication being raised, it would seem likely to raise it right
> when it occurred with Defense Counsel so Defense Counsel could bring it
> to the Court's attention at that point in time.  Number One.
> Number two is the again, the only indication in the motion is that his name
> was mentioned.  Mr. Sullivan.  And that's not legally sufficient to grant a
> Motion to Recuse because if that were the case, when a defendant
> claimed to hear his name being mentioned by a judge or by a state
> attorney, then, you know, that would, we would open the door to probably
> every case being recused if, if all he heard was his name being
> mentioned.

(Ex. D, doc. 35-1 at 153-55).  On direct appeal, Petitioner raised this issue as a trial

court error.   (*See* Initial Brief of Appellant, Ex. G, doc. 35-1 at 421-26 & doc. 35-2 at 1).

The First DCA *per curiam* affirmed.  (*See* Ex. J).

        2.        Clearly Established Supreme Court Law

        Petitioner's specific argument is that the trial judge erroneously made findings of

fact in denying his motion to recuse rather than determining the legal sufficiency of the

actual pleading as required by Rule 2.160 and by Florida statutory law as to the recusal

or disqualification of a judge.   In his petition, Petitioner has not alleged a federal constitutional violation nor has he cited any Supreme Court law establishing his entitlement to federal habeas relief on this claim.   It is well established that a violation of state law is not a ground for federal habeas relief.   *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law ...."); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").

     3.      Federal Review of Claim

     Because Petitioner's claim  involves solely state law issues, it cannot serve as the basis for a federal habeas claim.  To the extent that Petitioner is arguing that Judge Sirmon's failure to recuse himself violates his due process rights to a fair and impartial judicial officer, he has demonstrated no actual bias.  There is no Supreme Court decision clearly establishing that an appearance of bias or partiality, where there is no actual bias, violates the Due Process Clause or any other constitutional provision.  *See Hendrix v. Sec'y, Fla. Dep't of Corr.*, 527 F.3d 1149  (11th Cir. 2008) (holding that state court's decision, that habeas petitioner's due process rights were not violated by judge's refusal to recuse himself from murder trial, based upon fact that judge had briefly advised attorney for petitioner's co-defendant before he had become judge, was not contrary to, or unreasonable application of, clearly established federal law, so as to warrant habeas relief, given that no Supreme Court decision clearly established that appearance of bias, absent actual bias, violated Due Process Clause.); *Davis v. Jones*, 506 F.3d 1325 (11th Cir. 2007)("'[a] fair trial in a fair tribunal is a basic requirement of due process.' However, there is no claim, much less showing, of any error or actual bias by Judge Teel. Rather, Davis makes only an appearance claim, and, as outlined below, none of the Supreme Court cases relied upon by Davis establishes that an appearance problem violates the Due Process Clause.'" (citations omitted)).

     Furthermore, assuming *arguendo* that Petitioner's claim involves a federal constitutional principle, the state court's per curiam affirmance is entitled to deference. While Respondents argue that this claim is procedurally defaulted, in order to be subject

to a procedural bar on habeas review the last state court to render judgment on the issue "must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001); *see Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990). Because the state court did not expressly deny the claim pursuant to a state procedural bar, its decision is considered an adjudication on the merits which is subject to deference under AEDPA. *See Harrington v. Richter*, 562 U.S. 86, 98 (2011)("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated."). Under Florida law, the test for legal sufficiency of a motion to recuse is whether, under the facts alleged, a reasonably prudent person would have a well-founded fear of not receiving a fair and impartial trial. *See Livingston v. State*, 441 So. 2d 1083, 1087 (Fla. 1983)("The facts alleged in the motion need only show that the party making it has a well grounded fear that he will not receive a fair trial at the hands of the judge." (quotation marks and citation omitted)); *Jackson v. State*, 599 So. 2d 103, 107 (Fla. 1992)("A motion to disqualify must be well-founded and contain facts germane to the judge's undue bias, prejudice, or sympathy."); *Rogers v. State*, 630 So. 2d 513, 515 (Fla. 1993)("The ultimate inquiry is whether the facts alleged would place a reasonably prudent person in fear of not receiving a fair and impartial trial." (quotation marks and citation omitted)). Petitioner had not demonstrated that the trial court's determination that he did not have a well-founded fear of impropriety or partiality was unreasonable nor has he demonstrated that the trial judge was biased or prejudiced against him. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Therefore, Petitioner is not entitled to habeas relief on this ground.

## IV.  CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.

Petitioner fails to make a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining substantial showing) (citation omitted).  Therefore, the Court should deny a certificate of appealability in its final order.  The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  The parties shall make any argument as to whether a certificate should issue by objections to this report and recommendation.  Leave to appeal in forma pauperis should also be denied.  *See* Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is filed, the court may certify appeal is not in good faith or party is not otherwise entitled to appeal in forma pauperis).

## V.  CONCLUSION

Accordingly, it is therefore respectfully **RECOMMENDED**:

1.    That the second amended petition for a writ of habeas corpus (doc. 22) be **CONDITIONALLY GRANTED** only as to Petitioner's claim that his conviction and sentence for violating Florida Statutes sections 316.1935, 893.147 and 893.13, when his trial counsel was constitutionally ineffective by defending his case based on the legally impermissible defense of voluntary intoxication instead of advising Petitioner to accept the State's pretrial plea offer, violated his federal right to effective assistance of counsel, and that the State reoffer the pretrial plea agreement to Petitioner with regard to Bay County Circuit Court Case No.: 03-2363 within **NINETY (90) DAYS** from the date of judgment in this case.  If Petitioner accepts the offer, it will be left to the state trial court to  exercise its discretion in making a determination with regard to Petitioner's

convictions and sentence given all the circumstances of the case.

2.     That the remaining claims in the second amended petition for a writ of habeas corpus, claims two through five, (doc. 22) be **DENIED**.

3.     That a certificate of appealability be **DENIED** as to the remaining claims in the second amended petition for a writ of habeas corpus (doc. 22) and that leave to appeal in forma pauperis be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on June 15, 2015.


S/  Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**